# Richmond

GRACE McWHORTER v. COMMONWEALTH OF VIRGINIA.

January 15, 1951.

Record No. 3748.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*James P. Hart, Jr.* and *T. Keister Greer*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Henry T. Wickham, Assistant Attorney General,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

Grace McWhorter, hereinafter called the defendant, was arrested on May 20, 1949, in the city of Roanoke, on a warrant which charged her with unlawfully interfering and attempting to interfere, by the use of insulting and threatening language, with Pauline Fleenor in the exercise of the latter's right to work at a local establishment. Upon conviction in the police court the defendant appealed to the Hustings Court where she was tried by a jury, convicted, and her punishment fixed at three months imprisonment and a fine of $250. To review the judgment entered upon that verdict the present writ of error has been allowed.

The prosecution is based upon section 1 of chapter 229

of the Acts of 1946, which is printed in full in the margin,[1] and now embodied in the Code of 1950 as section 40-64.

The circumstances out of which the prosecution arose are these: In April, 1949, there was a strike of certain female employees of the Roanoke Garment Company, a textile manufacturing concern located in that city. The company employed approximately one hundred women, and six employees who were members of the International Ladies Garment Workers Union went on strike. On April 18 the defendant, Grace McWhorter, was sent by union officials to the Roanoke plant to seek employment and to determine working conditions there. She worked on April 19 and 20, and on the 27th, as a union organizer, joined the pickets who were walking to and fro along the sidewalk in front of the plant.

The gist of the Commonwealth's case is that on May 20, and at other times prior thereto during the strike, the defendant and other pickets had, in front of the doorway of the plant and in the presence of Pauline Fleenor, a female employee of the company who had not struck, sung songs embracing obscene and insulting words, and had directed such language and other insulting and threatening words

[1] "Section 1. It shall be unlawful for any person singly or in concert with others to interfere or attempt to interfere with another in the exercise of his right to work or to enter upon the performance of any lawful vocation, by the use of force, threats of violence or intimidation, or by the use of insulting or threatening language directed toward such person, to induce or attempt to induce him to quit his employment or refrain from seeking employment.

"Section 2. It shall be unlawful for any person to engage in picketing by force or violence, or to picket alone or in concert with others in such manner as to obstruct or interfere with free ingress or egress to and from any premises, or to obstruct or interfere with free use of public streets, sidewalks or other public ways.

"Section 3. It shall be unlawful for any person who is not, or immediately prior to the time of the commencement of any strike was not, a bona fide employee of the business or industry being picketed to participate in any picketing or any picketing activity with respect to such strike or such business or industry.

"Section 4. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and punished accordingly.

"Section 5. If any part of this act shall be held to be invalid, the remainder thereof shall not be affected, but remain in full force and effect."

toward this employee for the purpose of inducing or attempting to induce her to quit her employment; and that such conduct so unnerved and upset Mrs. Fleenor as to cause her to faint, with the result that she was forced to quit her employment, at least temporarily, on May 20, the day of the defendant's arrest.

Whether the evidence was sufficient to warrant a finding by the jury that it constituted a breach of the statute will be discussed later. Preliminary to that discussion we must dispose of the defendant's contention that the statute, as construed and applied in the present prosecution, constituted an abridgment of the right of freedom of speech guaranteed to her under the First and Fourteenth Amendments to the Federal Constitution. *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 570, 571, 62 S. Ct. 766, 768, 769, 86 L. ed. 1031, and cases there cited.

The position of the defendant is thus stated in her brief: "One of the basic purposes of picketing, of course, is to communicate the fact of the existence of a strike, and to render it effective by inducing or attempting to induce others to quit their employment or to refrain from seeking employment at the struck store or factory. On its face this statute contravenes that form of free speech which manifests itself as the 'picket line.'" Indeed, she says, the statute was "designed to end the practice" of picketing.

Again, she says: "Insulting language on a picket line was protected by" the Supreme Court of the United States in *Cafeteria Employees Union* v. *Angelos*, 320 U. S. 293, 64 S. Ct. 126, 88 L. ed. 58.

With respect to the last contention, we do not interpret the decision in the *Cafeteria Case, supra,* or any other of the Supreme Court, as supporting the view that "insulting language on a picket line" is "protected" by the right of freedom of speech.

The *Cafeteria Case, supra,* involved the validity of an injunction restraining picketing which, though peaceful, was accompanied by statements that the establishment was "unfair to organized labor," and that those who patronized it

"were aiding the cause of Fascism," which statements the lower court held were knowingly false. The Supreme Court held that the use of such "loose language or undefined slogans" did not constitute such a falsification of the facts as to make peaceful picketing unlawful and subject to injunction.

In *Terminiello* v. *Chicago*, 337 U. S. 1, 69 S. Ct. 894, 93 L. ed. 1131, also relied on by the defendant, a conviction on a charge that an address delivered in an auditorium tended to a "breach of the peace" in violation of a local ordinance, was reversed in a five-to-four decision on the ground that the ordinance, as construed by the court in its instruction to the jury, permitted a conviction by a general verdict, not only for the use of language which constituted a "breach of the peace" and which might be prohibited, but also for the use of language which "stirred people to anger, invited public dispute, or brought about a condition of unrest," which latter, as the court said, was within the protected area of free speech.

The Supreme Court has repeatedly held that the right or privilege of free speech has its limitations. In *Chaplinsky* v. *New Hampshire, supra,* it held that the constitutional right of free speech is not violated by a state statute which makes it a crime to address any offensive, derisive, or annoying word to any person lawfully in a public place, or to call him by an offensive or derisive name, which has a direct tendency to cause acts of violence by the person to whom individually the remark is addressed. In the course of the unanimous opinion this was said:

"Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend

to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. * * *"

See also, *Cantwell* v. *Connecticut*, 310 U. S. 296, 60 S. Ct. 900, 84 L. ed. 1213, 128 A. L. R. 1352.

█ To adopt the contention of the defendant and hold that those on the picket line, in the exercise of free speech, are "protected" in the use of insulting language would be to grant to such persons a privilege and immunity not accorded other citizens. It would mean that they were exempt from actions for libel or slander or from criminal prosecutions for the violation of statutes prohibiting such conduct.

█ We see nothing in the section of the statute here under review which supports the assertion of the defendant that it was "designed to end the practice, common to labor disputes, known as 'picketing.'" It does not prohibit "peaceful picketing or peaceful persuasion" in connection with labor disputes which are protected under the constitutional guaranty of freedom of speech. *American Federation of Labor* v. *Swing*, 312 U. S. 321, 61 S. Ct. 568, 85 L. ed. 855.

The section is not aimed at the use of "insulting" words or language as such. It does not prohibit or punish the use of offensive words by one picket toward another picket, or toward one not connected with the particular industrial plant concerned in a labor dispute. Nor does it, as the defendant argues, confine those on the picket line to language suitable only to the "drawing room" or the "parlor car."

█ Its prohibition is within a narrow scope. It condemns as unlawful "the use of force, threats of violence or intimidation," or "the use of insulting or threatening language" to "induce" one who desires to work to "quit his employment or refrain from seeking employment." Its plain purpose is to protect the inherent right to work from the "clear and present danger" of destruction by those who, by the use of

force, threats, violence, intimidation, or insulting words, would prevent the exercise of that right.

Our concept of "liberty," as that word is used in the Constitution of the United States and the Constitution of Virginia, embraces the right to work and earn a living as well as the right to speak freely. See *Young* v. *Commonwealth*, 101 Va. 853, 862, 863, 45 S. E. 327; *Finney* v. *Hawkins*, 189 Va. 878, 884, 54 S. E. (2d) 872, 875. Each of these fundamental rights has its limitations, and the abuse of each is subject to legislative restraint under the State's police power.

We hold that the prohibition in this section of the statute against the interference with the right to work by the use of force, threats, violence, intimidation, or insulting words, acts which are inherently wrong and liable to bring about an immediate breach of the peace, is within the police power of the State and does not trespass upon the constitutional right of freedom of speech.

Similar statutes making it a criminal offense to interfere with a person's right to work by threats, intimidation, or otherwise, are found in other States. Some of these are collected in the annotation found in 123 A. L. R., p. 316. For later cases construing such statutes, see *Gurein* v. *State*, 209 Ark. 1082, 193 S. W. (2d) 997; *Commonwealth* v. *Ramey*, 279 Ky. 810, 132 S. W. (2d) 342; *State* v. *Jakubowski*, 251 Wis. 74, 27 N. W. (2d) 742.

In *People* v. *Washburn*, 285 Mich. 119, 280 N. W. 132, 123 A. L. R. 311 (appeal denied, 305 U. S. 577, 59 S. Ct. 355, 83 L. ed. 363), the constitutionality of such a statute was upheld. In no other case, so far as we have been able to find, has the constitutional question been passed on.

In *Edwards* v. *Commonwealth, ante*, p. 272, 60 S. E. (2d) 916, we held that the third section of the statute here under consideration, which makes it unlawful for any person who is not a *bona fide* employee of the business or industry being picketed to participate in any picketing or any picketing activity with respect to such business or industry, was an invalid invasion of the constitutional right of freedom of

speech. There is no such vice in the first section of the statute with which we are presently concerned.

The defendant next contends that the section is invalid class legislation, in that it is directed against conduct by "a particular group" engaged in the "particular practice of picketing," which is prohibited by the due process clause of the Fourteenth Amendment. Here the argument is that inasmuch as the use of violent, abusive, insulting, or obscene language is punishable under various other criminal statutes, applicable to all persons, the State may not by a statute single out a particular group and punish such acts by the members of that group.

There are several ready answers to this argument. In the first place, as has been pointed out, the section is not aimed at offensive language as such, but only that which is used in interfering with another's right to work.

Next, the prohibition in the section is not directed against those in the picket line alone, but outlaws interference with the right to work by "any person singly or in concert with another."

But aside from this, it is well settled that where the reason for a classification inheres in the subject-matter and the classification is natural and substantial and bears a reasonable relationship to the evil sought to be controlled, it is valid. 12 Am. Jur.; Constitutional Law, sec. 481, p. 151 *ff*.

There are many criminal statutes which are designed to prohibit evils which may arise during the activities of particular groups, trades, or occupations. So long as such classifications are not arbitrary and unreasonable, and so long as such laws operate without discrimination on all persons and classes of persons similarly situated in that group, they are not outlawed under the equal protection clause of the Fourteenth Amendment.

As was said in *American Federation of Labor* v. *American Sash, etc., Co.*, 335 U. S. 538, 542, 69 S. Ct. 258, 259, 93 L. ed. 222, 225, 6 A. L. R. (2d) 481, upholding the "right to work" provision in the Arizona Constitution, "the existence of evils against which the law should afford pro-

tection and the relative need of different groups for that protection 'is a matter for the legislative judgment.' "

We pointed out in *Edwards* v. *Commonwealth, supra* (*ante*, at page 285, 60 S. E. (2d) at page 922), that picketing is subject to regulation by the State provided such regulation has a "reasonable basis in prevention of disorder, restraint of coercion, protection of life or property, or promotion of the general welfare."

In *People* v. *Washburn, supra,* the court rejected the contention that a similar criminal statute, prohibiting interference with the right to work, was class legislation inhibited by the Fourteenth Amendment.

We come next to the consideration of the evidence which the defendant contends does not warrant the finding that she directed any insulting or threatening words or language toward the prosecuting witness, Mrs. Fleenor. We, of course, review the evidence in the light of the verdict.

Mrs. Fleenor testified that the defendant was on the picket line on the morning of May 20; that when she (Mrs. Fleenor) came to work the defendant and the other pickets gathered around her and the other women who desired to work, singing songs "about scabs coming" and "something about 'When the roll is called up yonder, will you whores be there.' " This witness testified that the defendant, in concert with others, had sung similar songs to her on previous occasions. To the question, "Did Grace join in those songs?" she replied, "Yes, sir." This witness further testified that the defendant "stuck her head in the door and screamed 'whee' and 'scabs,' " and that while on other occasions this had the effect of making her (Mrs. Fleenor) "stop work," this time she fainted, was unable to continue work that day, and was taken by her husband to a physician.

H. L. Fleenor, the husband of the principal Commonwealth's witness, testified that when he came to the plant upon having been notified that his wife had fainted, and was taking her home, "this lady" (referring to the defendant) and "Mrs. Johnson" sang "There goes the scabs," and then changed off and sang about "Pauline and the Bible."

Mrs. Flora Spradlin, another witness for the Commonwealth, testified that prior to May 20 similar vulgar songs were sung in Mrs. Fleenor's presence; that "instead of saying 'When the roll is called up yonder, will you be there,' they would say 'When the roll is called up yonder, will you whores be there;' " and that "then they would sing about Pauline and the Bible and squalled in the door." When asked how long this condition had been going on, this witness replied: "Since the strike started. The other girls did it, too, but she (referring to the defendant) is the ringleader of all of it."

Miss Sadie Spradlin corroborated the testimony of the preceding witness as to the vulgar and insulting language used. She was asked, "Who did this screaming and hollering at the time Pauline fainted?" and her answer was, "Grace McWhorter did the most that day. She did the loudest."

Witnesses for the Commonwealth testified that as the result of this conduct on the part of the defendant and her associates, the women employed in the plant who desired to continue their work were nervous and upset and were unable to do their work efficiently. That such was the purpose of the defendant is, of course, obvious.

The defendant admitted that she was on the picket line on May 20, the day of her arrest, and that she took part in the singing. She denied that the word "whore" was used in the songs, but admitted that she had addressed the employees who were continuing their work as "scabs," and that some of the songs used on the picket line embraced this term.

■ That these words were "insulting" and intended to be so is clear. It is a matter of common knowledge that no epithet is more offensive and insulting to a virtuous woman than to be addressed or spoken of as a "whore."

■ It is also a matter of common knowledge that the word "scab" is known and employed in labor union circles as an opprobrious and insulting epithet. Webster's New International Dictionary, 2d Ed., Unabridged, lists "scab" as an "'opprobrious" word in "Trade-Unionism." See also,

*United States* v. *Taliaferro* (D. C. Va.), 290 F. 214, 218 (affirmed C. C. A. 4, 290 F. 906); *Lassiter* v. *Swift & Co.,* 204 Ga. 561, 50 S. E. (2d) 359, 363; *Evening Times Printing, etc., Co.* v. *American Newspaper Guild,* 124 N. J. Eq. 71, 199 A. 598, 602.

Indeed, in the case now before us, one of the strikers who took part in the picketing at the Roanoke plant admitted on cross-examination that the word "scab" would be insulting to her.

█ It thus appears that the evidence is amply sufficient to warrant the finding that insulting words were used by the defendant toward the witness, Mrs. Fleenor, and the other workers for the purpose of inducing or attempting to induce them to quit their employment.

Error is assigned to the action of the trial court in admitting evidence of the acts and conduct of the defendant prior to May 20, 1949, the date mentioned in the warrant. This, it is said, violates the principle that in a prosecution for a particular crime evidence of the commission of other offenses, though similar in character, is not admissible. 20 Am. Jur., Evidence, sec. 309, p. 287 *ff*; 22 C. J. S., Criminal Law, sec. 682, p. 1084 *ff*; 7 Michie's Jur., Evidence, sec. 48, p. 390 *ff*.

█ But there are well-settled exceptions to and limitations on this rule. When guilty intent is an essential element of the offense charged, evidence of similar acts committed by the accused and of his conduct at or about the time of the commission of the offense charged against him is admissible as tending to establish his criminal intent or motive. 20 Am. Jur., Evidence, sec. 313, p. 293 *ff*.

As Mr. Wigmore puts it, such evidence of similar acts is admissible to negative an "innocent intent." Wigmore on Evidence, 3d Ed., Vol. 2, sec. 302, p. 196 *ff*.

█ Another exception to the general rule is that evidence of similar acts is admissible to show a common scheme, design, or plan where there is "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the

individual manifestations." Wigmore on Evidence, 3d Ed., Vol. 2, sec. 304, p. 202. See also, *Boyd* v. *Commonwealth*, 156 Va. 934, 944, 157 S. E. 546.

In 20 Am. Jur., Evidence, sec. 314, p. 297, the author says that under this exception, "It is competent to show that the crime charged consisted of several stages or continuous acts, all constituting one transaction. The fact that some of the other offenses were remote in point of time from the act under investigation does not of itself render such evidence incompetent, especially where the acts were repeatedly done up to a comparatively recent period and were all apparently inspired by one purpose."

Mr. Wigmore points out that under the "Intent principle" and under the "Design or System principle" evidence of similar acts are admissible "on a charge of rioting," or the like. Wigmore on Evidence, Rev. Ed., sec. 367, pp. 287, 288.

In 22 C. J. S., Criminal Law, sec. 691, p. 1174, we find this pertinent statement: "In a prosecution for inciting to riot and being concerned in a riot, by means of disorderly picketing and abusive language, evidence that, within a limited time prior to the date laid in the indictments, accused had been present among strikers who were committing riotous acts is admissible to show intent, absence of mistake or accident, and that the specific act charged was part of a common purpose or design, and to negative the defense that accused was merely an innocent bystander."

Under these principles the evidence complained of was clearly admissible. The continuous and repeated acts and conduct of the defendant tended to show that the offensive words which she either singly or in concert with others directed toward Mrs. Fleenor and the latter's co-workers were intended to be insulting and were uttered for the purpose of inducing or attempting to induce these employees to quit their employment. Such repeated acts and conduct were a part of the single design or plan of the defendant to bring about her desired result.

We think, too, that the statute is sufficiently broad

to prohibit a course of conduct such as is shown here. Insults or threats uttered on a single occasion may not induce one to quit his employment, while a continuance of such acts may, and indeed is more likely to, have that effect. As Mrs. Fleenor said, such conduct on the part of the defendant and her companions at first merely had the effect of temporarily interfering with her work. But on the day of the defendant's arrest this witness succumbed to the repeated offenses, lost consciousness, had to leave her work, and was placed under the care of a physician.

What we have just said disposes of the complaint as to the instruction given at the request of the Commonwealth. The jury were told that if they believed beyond a reasonable doubt that "on May 20, 1949, *and* at times prior thereto," the defendant attempted to interfere with Mrs. Fleenor in the exercise of her right to work by the use of insulting and threatening language, they should find the defendant guilty. This instruction was more favorable to the defendant than she was entitled to. It required the Commonwealth to prove that the offense with which she was charged was committed both on the date specified "*and* at times prior thereto."

Nor do we think there is any substance to the claim of the defendant that she was prejudiced by the evidence of the acts of the other strikers. The fact that others joined the defendant in the use of insulting language toward the prosecuting witness is no defense against her own conduct. The statute contemplates such a situation, for it prohibits the use of insulting language by "any person singly or in concert with others."

The final assignment that the conduct of the Commonwealth's attorney was improper and prejudicial to the defendant is entirely without merit.

On the whole we find no error in the record and accordingly the judgment is

*Affirmed.*