UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC, et al., Plaintiffs,

v.

John N. DALTON, et al., Defendants.

Civ. A. No. CA–79–11–NN.

United States District Court,
E. D. Virginia,
Newport News Division.

May 21, 1982.

See also, D.C., 544 F.Supp. 291.

R. M. Brown, Jr., Hudgins & Neale, Newport News, Va., Robert H. Stropp, Jr., Cooper, Mitch & Crawford, Birmingham, Ala., for plaintiffs.

Marshall Coleman, Atty. Gen. of Va., Gregory M. Luce, Asst. Atty. Gen. of Va., Richmond, Va., Robert V. Beale, City Atty., Kris J. Sundberg, Asst. City Atty., Newport News, Va., for defendant.

## MEMORANDUM ORDER

MacKENZIE, Chief Judge.

This action stems from a strike at the Newport News Shipbuilding and Dry Dock Company (The Company) in the winter and early spring of 1979. The plaintiff United Steelworkers of America (The International) had been certified as the exclusive bargaining representative for production and maintenance workers at The Company. These workers were organized as Local Union 8888 (The Local) of the International. On December 10, 1978, the membership of The Local authorized a strike at The Company's facility. The strike commenced on January 31, 1978.

Prior to the strike's commencement, the then Governor of the Commonwealth of Virginia, John N. Dalton, announced his intention, in regard to the impending strike, to enforce all the laws of the Commonwealth. Among these laws are: § 40.1–53 of the Code of Virginia, headed: Preventing persons from pursuing lawful vocations, etc.; illegal picketing; injunction; § 18.2–406 of the Code of Virginia, headed: What constitutes an unlawful assembly; punishment; and § 18.2–407 of the Code, headed: Remaining at place of riot or unlawful assembly after warning to disperse.

Plaintiff Hower is employed by the International and acted as an organizer and representative on behalf of The Local. Plaintiff Crosby is president of The Local. Defendant Austin is the Chief of Police of the City of Newport News. On December 8, 1978, defendant Austin sent plaintiff Hower a letter stating guidelines for the control of pickets. Attached to the letter were copies of various statutes defendant Austin intended to cause to be enforced. Included among these were § 18.2–406, § 18.2–407, and § 40.1–53 of the Code of Virginia.

In their original complaint, filed one day prior to the strike's start, plaintiffs challenged these statutes, and the picketing

guidelines, as unconstitutional on their face. Specifically, they challenged § 40.1–53—the Virginia right to work law—as preempted by the Labor Management Relations Act, 29 U.S.C. § 141, et seq., especially §§ 157 and 158(a)(1). All three statutes, and the picketing guidelines, were challenged as an abridgement of rights guaranteed by the First Amendment. Plaintiffs sought both declaratory and injunctive relief. As the strike is long since over, there is no need for the Court to consider plaintiffs' plea for injunctive relief.

On April 20, 1979, during the strike, plaintiff filed a motion to amend the complaint. The amended complaint was filed on April 26, 1979. The amended complaint included not only the challenges already mentioned, but also complaints relating to events—principally police conduct—that took place during the course of the strike. Added as defendants were the City of Newport News, Newport News Police Officers Steve Pauley, T. L. Penny, Richard Dawes and Smith, State Trooper White, and Sergeant Wescott.

In response to all this, motions to dismiss and motions for summary judgment have been filed. Argument has been heard on the motion of defendants Dalton and Austin to dismiss the original complaint.

■ At the time the original complaint was filed, the strike had not yet commenced. Because of that, defendants Dalton and Austin have challenged the jurisdiction of this Court to hear the challenges the plaintiffs have brought to the cited Virginia statutes. Without regard to the effect the subsequent enforcement of these statutes may have had on the viability of these claims, a live case or controversy existed at the time this action was filed.

This action, insofar as it challenged the several Virginia statutes, was filed on January 30, 1979. The strike was set to begin the following day—January 31, 1979. By letter dated December 8, 1978, defendant Austin stated his intention to enforce, and drew the plaintiffs' attention to, the statutes here in question. On the day this action was commenced, therefore, the threat of enforcement was real and immediate. Plaintiffs were fearful, and alleged, that they would be prosecuted for the actions they planned to engage in. A live case or controversy existed. *See Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Younger v. Harris,* 401 U.S. 47, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

Turning to the merits of plaintiffs' complaint, the Court will deal first with plaintiffs' challenge to the Virginia right to work law. Va.Code § 40.1–53.[1] Plaintiffs mount a two pronged attack on this statute. With one prong, they attack the statute as an infringement of their first amendment rights; with the other, they attack the statute as preempted by the Labor Management Relations Act. The language plaintiffs find fault with is "No person shall . . . interfere or attempt to interfere with another in the exercise of his right to work . . . by the use of . . . *insulting* or threatening *language* directed toward such persons . . . ." *Id.* (emphasis added)

1. § 40.1–53. Preventing persons from pursuing lawful vocations, etc.; illegal picketing; injunction.—No person shall singly or in concert with others interfere or attempt to interfere with another in the exercise of his right to work or to enter upon the performance of any lawful vocation by the use of force, threats of violence or intimidation, or by the use of insulting or threatening language directed toward such person, to induce or attempt to induce him to quit his employment or refrain from seeking employment.

No person shall engage in picketing by force or violence, or picket alone or in concert with others in such manner as to obstruct or interfere with free ingress or egress to and from any premises, or obstruct or interfere with free use of public streets, sidewalks or other public ways.

Any person violating any of the provisions of this section shall be guilty of a misdemeanor, and punished accordingly.

Notwithstanding the punishments herein provided any court of general equity jurisdiction may enjoin picketing prohibited by this section, and in addition thereto, may enjoin any picketing or interference with lawful picketing when necessary to prevent disorder, restrain coercion, protect life or property, or promote the general welfare. (Code 1950 (Repl.Vol.1953), § 40–64; 1952, c. 674; 1970, c. 321; 1974, c. 254.)

The right of free expression is among the most cherished of the rights of free men. The right, however, is not limitless. Obscene material, libelous writings, and commercial speech are all examples of speech that is either unprotected or subject to regulation. Fighting words are also a category of unprotected speech, and, defendants argue, fighting words are just what § 40.1–53 proscribes.

■ Statutes that regulate expression must be carefully scrutinized. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). "The statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972).

This statute was authoritatively construed by the Supreme Court of Virginia in *McWhorter v. Commonwealth*, 191 Va. 857, 63 S.E.2d 20 (1951). In that case, relying on *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the Court found that the statute here in question was meant to apply to language that was intimidating, coercive, or constituted fighting words. The Court was clear in holding that the statute was not applicable to "peaceful persuasion" or mere "insulting words."

[The statute] does not prohibit "peaceful picketing or peaceful persuasion. . . ."

The section is not aimed at the use of "insulting" words or language as such. It does not prohibit or punish the use of offensive words by one picket toward another picket, or toward one not connected with the particular industrial plant concerned. . . . Nor does it, as the defendant argues, confine those on the picket line to language suitable only to the "drawing room" or the "parlor car."

Its prohibition is within a narrow scope. . . . Its plain purpose is to protect the inherent right to work from the "clear and present danger" of destruction by those who . . . would prevent exercise of that right.

*McWhorter v. Commonwealth*, 63 S.E.2d at 24.

*McWhorter* also found the statute constitutional as applied. The Court upheld the finding that the defendant strikers' actions amounted to coercive, intimidating conduct. The striker had not simply engaged in the shouting of insulting language; her conduct was such that she caused a strike breaker to faint. 63 S.E.2d at 25. Thus, the Virginia Supreme Court has construed this statute as applicable only to speech that is intimidating or coercive by nature, and has upheld the application of the statute only in such situations.

A fair reading of this statute, independent of *McWhorter*, also leads to the same conclusion. The words "insulting or threatening language" cannot be read in a vacuum. They must be read in the context of the sentence of which they are a part. These words are preceded by the words "By the use of force, threats of violence or intimidation." Such words precedent color the meaning of the words that follow. Read as a whole, the language of the statute prohibits the use of language violent in nature, language "which can be construed as expressing an actual intention of inflicting injury." *Radford v. Webb*, 446 F.Supp. 608, 611 (W.D.N.C.1978).

In *Chaplinsky v. New Hampshire*, the Supreme Court upheld the conviction of a man convicted under the following New Hampshire statute:

No person shall address any offensive, derisive or annoying word to any person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation.

Public Law of New Hampshire, CL. 378 § 2; quoted in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 569, 62 S.Ct. 766, 768, 86 L.Ed. 1031 (1943). The language of the statute, on its face, did not carry a violent or threatening connotation. The New

Hampshire Supreme Court, however, had construed the statute as limited to a proscription of fighting words. The defendant had been convicted on the basis of calling the complainant "a God damned racketeer" and "a damned facist." *Id.* at 569, 62 S.Ct. at 768. In upholding the conviction, the Court held that these words, of themselves, constituted fighting words. "Argument is unnecessary to demonstrate that [such] appellations ... are epithets likely to provoke the average person to retaliation." *Id.* at 574, 62 S.Ct. at 770.

The statute here in question is more narrow than that approved in *Chaplinsky.* The statute is addressed to words violent in nature. Virginia has it within her police power to proscribe such conduct.

[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell v. Connecticut,* 310 U.S. 296, 309–310.

*Id.* at 571–72,[2] 62 S.Ct. at 769.

■ On its face, § 40.1–53 of the Code of Virginia infringes no right protected by the First Amendment.

Plaintiffs' second prong is that the statute has been preempted by the Labor Management Relations Act. Plaintiffs aver that the statute proscribes conduct protected under the LMRA. Section 7 of that Act, 29 U.S.C. § 157, guarantees workers the right to organize, the right to strike, and the right to attempt to persuade other workers to join them in concerted action. Plaintiffs argue that under the LMRA, the form of persuasion is not limited to that suitable only for the parlor. This contention is correct. "The imaginative vituperation which is commonplace in labor strife well exceeds the 'normal' levels of hyperbole to which most members of the community may be accustomed." *National Association of Letter Carriers v. Austin,* 418 U.S. 264, 290, 94 S.Ct. 2770, 2784, 41 L.Ed.2d 745 (1974) (Douglas, J., concurring).

■ The hurling of insults is protected under the LMRA. *National Association of Letter Carriers v. Austin, supra* at 278 (1974); *Linn v. United Plant Guard Workers of America,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The existence of the LMRA, however, does not preclude the states from the exercise of their usual police power. The states remain free to act to protect the public peace and order. *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); *Linn v. Plant Guard Workers of America, supra, Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957); *Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Board,* 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942).

Here, the statute is not aimed at merely insulting language. The statute's focus is on language the user intends to be, or is in and of itself, intimidating or coercive. Proscribed is the use of words through which the speaker intends to convey a threat of impending harm.

**2.** The Supreme Court has recently stated: "Conduct designed not to communicate but to coerce merits... less consideration under the First Amendment." *International Longshore-* *men's Ass'n. v. Allied Int'l., Inc.,* —— U.S. ——, ——, 102 S.Ct. 1656, 1665, 72 L.Ed.2d 21 (1982).

■ Violent or intimidating language—fighting words—are not protected under the LMRA. *Youngdahl v. Rainfair, supra, Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Board, supra.* "We have drawn the line at conduct that is intended to threaten or intimidate nonstrikers." *NLRB v. Pepsi-Cola Company of Lumberton, Inc.*, 496 F.2d 226, 228 (4th Cir. 1974); *compare Garrett Railroad Car and Equipment, Inc.*, 1980–81 NLRB Dec. ¶ 17,-988 (1981) (use of abusive or obscene language does not cause a striking employee to lose the Act's protection); *Hotel, Motel & Restaurant Employees & Bartenders Union Local # 466*, 1971 NLRB Dec. ¶ 23,193 (1971) (insults are protected speech under § 8(c) of the Act); *Central Massachusetts Joint Board, Textile Workers Union*, 123 NLRB 590 (1959) (vile, obscene and insulting remarks made by pickets were protected under § 8(c) where remarks did not tend to intimidate, coerce or restrain nonstrikers). As this statute is addressed to unprotected conduct, it does not interfere with the federal scheme. The LMRA does not preempt Virginia's right to prohibit such conduct.

Because this statute, Va.Code § 40.1–53, prohibits only language calculated to coerce, intimidate, or lead to violence, it is not overbroad on its face. The statute does not infringe plaintiffs' first amendment rights. For the same reason, the statute is not preempted by § 8(a)(1) of the LMRA. Plaintiffs' complaint, insofar as it challenges § 40.1–53 on its face, must be dismissed.

3. § 18.2–406. What constitutes an unlawful assembly; punishment. Whenever three or more persons assembled share the common intent to advance some lawful or unlawful purpose by the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order, and the assembly actually tends to inspire persons of ordinary courage with well-grounded fear of serious and immediate breaches of public safety, peace or order, then such assembly is an unlawful assembly. Every person who participates in any unlawful assembly shall be guilty of a Class I misdemeanor. If any such person carried, at the time of his participation in an unlawful assembly, any firearm or other deadly or dangerous weapon, he shall be guilty of a Class 5 felony. (Code 1950, §§ 18.1–254.1, 18.-

Plaintiffs also challenge the facial validity of § 18.2–406[3] and 18.2–407[4] of the Virginia Code. These statutes define unlawful assembly, and make it unlawful to take part in, or remain at the site of, an unlawful assembly. Plaintiffs argue that the unlawful assembly statute, § 18.2–406, is unconstitutionally vague, and that § 18.2–407 is overbroad.

In *Owens v. Virginia*, 211 Va. 633, 179 S.E.2d 477 (1971) the Virginia Supreme Court overturned the predecessor to § 18.2–406. That statute provided:

(c) Whenever three or more persons assemble with the common intent or with means and preparations to do an unlawful act which would be riot if actually committed, but do not act toward the commission thereof, or whenever three or more persons assemble without authority of law and for the purpose of disturbing the peace or exciting public alarm or disorder, such assembly is an unlawful assembly.

Law of April 2, 1968, CL. 460 § 18.1–254.-1(c), 1968 Va.Acts (current version at Va. Code § 18.2–406).

Because peaceable assemblies posing no clear and present danger could be broken up under that statute, the Court found it constitutionally flawed. 211 Va. at 637, 179 S.E.2d at 479. In contrast, the Court referred approvingly to the common law definition of unlawful assembly, as recited in Black's Law Dictionary.[5] The common law

1–254.3; 1968, c.460; 1971, Ex.Sess., c.251; 1975, cc. 14, 15).

4. § 18.2–407. Remaining at place of riot or unlawful assembly after warning to disperse.— Every person, except the owner or lessee of the premises, his family and nonrioting guests, and public officers and persons assisting them, who remains at the place of any riot or unlawful assembly after having been lawfully warned to disperse, shall be guilty of a Class 3 misdemeanor. (Code 1950, § 18.1–254.4; 1968, c. 460; 1971, Ex.Sess., c. 251; 1975, cc. 14, 15.)

5. *Unlawful Assembly.* At common law. The meeting together of three or more persons, *to the disturbance of the public peace, and with the intention of cooperating in the forcible and*

definition was also considered and approved in *Heard v. Rizzo*, 281 F.Supp. 720 (E.D. Pa.), *aff'd per curiam*, 392 U.S. 648, 88 S.Ct. 2307, 20 L.Ed.2d 1358 (1968).

The language of § 18.2–406, the current statute, closely follows the common law definition of unlawful assembly. That definition requires the existence of circumstances evidencing a present threat of violence or breach of public order. There is no doubt that the states retain the right to maintain public order. "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace or order, appears, the power of the state to prevent or punish is obvious." *Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940). This statute does no more than exercise that power. On its face, § 18.2–406 does not impermissibly infringe upon plaintiffs' first amendment rights.

Section 18.2–407 requires those persons, with certain enumerated exceptions, present at the scene of an unlawful assembly or riot, to disperse from the scene after having been instructed to do so. Plaintiffs challenge this statute as overbroad since persons not engaged in any unlawful activity could be removed from the streets. Although plaintiffs are correct in asserting that the statute can be applied to cause the removal from the streets of persons engaged in wholly lawful activities, that fact does not require a holding that this statute is unconstitutional on its face.

Any action under § 18.2–407 can only be taken in conjunction with § 18.2–405, the riot statute, or § 18.2–406, the unlawful assembly statute. Thus, before § 18.2–407

can be invoked, the public peace and order must be in jeopardy. At such a time, it is not unreasonable to authorize the police to clear the streets. This is not a long term measure. Once order is restored, those engaged in lawful activity may return to the streets. But at the time of a disturbance, or when there is a clear and present danger of an immediate disturbance, the commonwealth requires that the police be able to take quick action. To require individual determinations of who is acting lawfully and who unlawfully would prove unduly burdensome. The ability of the police to restore order would be impaired; the restoration of order, unnecessarily slowed.

[9] For these reasons, plaintiffs' challenge to the facial validity of § 18.2–407 must be rejected. Plaintiffs' complaint, insofar as it challenges the facial validity of § 18.2–407, is dismissed.

Having dismissed plaintiffs' challenges to the facial validity of these Virginia statutes, we now turn to the allegations made by plaintiffs in the amended complaint. The claims found in the amended complaint are brought under 42 U.S.C. § 1983 and allege that the defendants, with the exception of John Dalton,[6] denied plaintiffs their first amendment rights of speech and assembly through the selective enforcement of the aforementioned Virginia statutes. Plaintiffs further allege that the defendants have used excessive force, physically assaulted plaintiffs, and arrested plaintiffs without probable cause, all for the purpose of denying plaintiffs their right to peacefully picket and to strike.

Defendant City of Newport News has moved to dismiss the complaint on the

---

*violent execution of some unlawful private enterprise. If they take steps towards the performance of their purpose, it becomes a rout; and, if they put their design into actual execution, it is a riot. To constitute offense it must appear that there was common intent of persons assembled to attain purpose, whether lawful or unlawful, by commission of acts of intimidation and disorder likely to produce danger to peace of neighborhood, and actually tending to inspire courageous persons with well-grounded fear of serious breaches of public peace.*

1 Black's Law Dictionary 1705 (4th ed. 1951).

**6.** The amended complaint and plaintiffs' more definite statement appear to include claims against Dalton. In plaintiffs' memorandum in opposition to defendant Dalton's motion to dismiss, filed September 24, 1979, however, plaintiffs state that the allegations of the amended complaint and more definite statement are not directed at Dalton..

ground that plaintiffs have asserted against it nothing more than an action premised upon a "respondeat superior" theory. Defendant Austin has moved for dismissal on the same ground. He further seeks dismissal on the ground that he is clothed in a cloak of qualified immunity and that nothing asserted in plaintiffs' complaint is sufficient to strip him of that cloak. Defendants Penny and Dawes also have moved for dismissal, simply asserting that the facts alleged are insufficient to state a cause of action under § 1983.

At this point, there is no need for a beleaguered discussion of the intricacies of § 1983. Defendant Austin is correct in claiming the protection of a qualified immunity. He enjoys that immunity whether his actions were taken in his "individual" or "official" capacity. *Paxman v. Campbell*, 612 F.2d 848 (4th Cir. 1980). Qualified immunity, however, protects only those actions taken in good faith. An official is not immune "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [person] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [person]." *Paxman v. Campbell, supra* at 859, quoting *Woods v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975).

Plaintiffs have alleged that defendant Austin was involved in meetings at which the City of Newport News' response to the strike was planned, that defendant Austin directed the actions of the police, including their discriminatory enforcement of the laws, and that defendant Austin was present during, and failed to prevent, the use of excessive police force. If proved, these allegations are sufficient to support a finding that defendant Austin did not act in good faith. These allegations also demonstrate that the claims against defendant Austin are not based upon a respondeat superior theory but upon the acts and omissions of Austin, himself.

Municipalities are proper parties in actions brought under § 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Municipalities cannot, however, be held liable under a simple respondeat superior theory. *Id.* at 691, 98 S.Ct. at 2036. The act or omission alleged to be a constitutional infringement must "implement or execute a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. at 2035. In short, the act or omission complained of must have been due to the municipality's policy or custom. A municipality's policy or custom is that which is "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694, 98 S.Ct. at 2037.

Here, plaintiffs seek to hold the City of Newport News liable for a litany of wrongs allegedly committed during the strike. These wrongs include: the use of excessive force by the city police in making arrests; the unleashing of german shepherd dogs without adequate cause; the making of arrests without probable cause; the discriminatory enforcement of the laws, including, but not limited to, the enforcement of the three statutes challenged in this action; the making of mass arrests without probable cause; the mounting of an attack by police on the strike headquarters; the beating of pickets; and other actions constituting harassment of the strikers. Because of these actions, plaintiffs claim the City of Newport News, through its agents, sought to prevent the plaintiffs from conducting lawful union activity. At its heart, plaintiffs' complaint is that the city engaged in strike breaking.

Based upon the record before the Court, material facts are in dispute. Neither summary judgment nor dismissal is now appropriate. Plaintiffs have alleged that the actions of the Newport News police were taken at the direction of defendant Austin. As Austin is the Chief of the Newport News Police, it is at least arguable that his is one "whose edicts or acts may

fairly be said to represent official policy." *Monell, supra* at 694, 98 S.Ct. at 2037. In addition, the record contains the affidavits of Austin, and Newport News City Manager Frank Smiley. Both affiants admit that meetings were held at which a strategy to deal with the strike was developed. Commonwealth Attorney Willard Robinson, Police Chief Austin, Judge Robert Phelps of the Newport News General District Court, Criminal Division, and City Manager Smiley were present at one meeting. Another meeting was attended by Austin, Smiley, Robinson, and Captain Corvello of the Virginia State Police. Although both affiants state that no discussion of any illegal or unconstitutional acts toward the strikers took place, they do admit that the meeting's purpose was to devise a plan for police action in response to the strike. The Commonwealth's Attorney and the City Manager, at least for the purposes of the present motions, are shapers of official policy. At these meetings, the city policy was set for the use of police during the strike. Further factual development will be necessary before it can be determined just what actions police took toward the strikers and whether those actions were pursuant to city policy. Further factual development will be necessary, in fact, to determine just what city policy was. If the various actions complained of were taken pursuant to city policy, the City of Newport News may be held liable.

Defendants Penny and Dawes' motion for dismissal must be denied. Plaintiffs' more definite statement contains allegations that they engaged in the use of excessive force in response to the strike situation, and particularly in response to the events of April 16, 1979. The use of excessive force by police officers may state a claim under § 1983. *King v. Blankenship*, 636 F.2d 70 (4th Cir. 1980). Plaintiffs' allegations are sufficient to withstand the motion of defendants Penny and Dawes.

Having reviewed the motions and applicable law, it is therefore held that plaintiffs' challenge to the facial validity of §§ 40.1–53, 18.2–406, 18.2–407 of the Code

of Virginia is DISMISSED. As defendant Dalton is a party defendant only to those challenges, his motion for dismissal is GRANTED. Because further factual development is necessary before the Court can determine whether any of the acts and omissions of the City of Newport News, defendant Austin, defendant Penny and defendant Dawes violated the constitutional rights of plaintiffs, their motions to dismiss are DENIED. The matter will proceed.

It is so ORDERED.