## Michael Charles Satcher

### v.

## Commonwealth of Virginia

Record Nos. 920247 and 920248

September 18, 1992

Present: All the Justices

*John C. Youngs; Richard J. McCue* for appellant.
*Katherine B. Toone, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

In the first phase of a bifurcated trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Michael Charles Satcher of the robbery, assault and battery, and attempted rape of Deborah Abel and the robbery, rape, and capital murder of Ann Elizabeth Borghesani.[1] The jury fixed Satcher's punishment at imprisonment for life plus ten years and twelve months for the offenses against Ms. Abel and at two terms of life imprisonment for the noncapital offenses against Ms. Borghesani. In the second phase of the trial, the jury fixed Satcher's punishment for the killing of Ann Borghesani at death, based upon both statutory predicates of "future dangerousness" and "vileness."

After considering a postsentence report prepared by a probation officer, Code § 19.2-264.5, the trial court imposed the sentences fixed by the jury. Satcher is here for automatic review of his death sentence, and we have consolidated that review with his appeal of his capital murder conviction. Code § 17-110.1. We have also certified from the Court of Appeals Satcher's convictions for the offenses against Ms. Abel and the noncapital offenses against Ms. Borghesani. Code § 17-116.06. We have given the entire matter priority on our docket. Code § 17-110.2.

## FACTS

The incidents involving Ms. Abel and Ms. Borghesani both occurred on March 31, 1990, on a bicycle path that runs alongside Lee Highway, past the Air Force Association building, in the Rosslyn section of Arlington County. The bicycle path at this location is hidden from the view of motorists and pedestrians proceeding along Lee Highway by a "sound barrier wall" some fifteen to twenty feet in height.

Shortly before 7:00 p.m. on March 31, Ms. Abel was riding her bicycle along the path and had just passed the Air Force Association

---

[1] Under Code § 18.2-31(5), the "willful, deliberate, and premeditated killing of any person in the commission of, or subsequent to, rape or attempted rape or forcible sodomy or attempted forcible sodomy" constitutes capital murder.

building when she saw a man walking toward her. As they passed one another, they "made eye contact." The next thing she knew, she was pulled off her bicycle, dragged on her stomach into a ditch that ran alongside the bicycle path, and "jumped on from behind."

Every time Ms. Abel turned her head to plead with her assailant or to get a look at him, he would hit her in the head and face. She told him there was money in her purse and begged him to "go get that" and not "hit [her] anymore." As he continued to beat her, he managed to get her "pants part way down."

Suddenly, Ms. Abel's assailant "stopped what he was doing." It turned out that another cyclist, Mark Polemani, happened to pedal past the scene and saw a mountain bike "off the bike trail." He also observed a man kneeling down "right off the path," and when he saw the man "throw a punch to the ground," he stopped and got off his bicycle. When the man saw Polemani, he picked up Ms. Abel's purse and ran. Polemani pursued him, but he escaped.

Polemani returned to the scene to retrieve his bicycle and, for the first time, saw Ms. Abel. Her face and her sweatshirt were covered with blood and her "pants and her panties were down at her ankles." He walked with her to an apartment complex and knocked on a door. The police were called, and Ms. Abel was transported to a hospital. Several days later, her purse was found at a nearby parking lot. It contained her personal belongings, but no money.

At 8:00 p.m. on the same evening, Ann Borghesani was to be the guest of honor at a belated birthday party given for her by a friend who lived in the Crystal City area of Arlington County. Ms. Borghesani lived in an apartment at Rosslyn. From her apartment, it was about a five minute walk along the bicycle path, past the Air Force Association building, to a Metro station, where Ms. Borghesani could have taken a train to Crystal City.

Ms. Borghesani was last seen alive about 7:10 p.m. by her roommate, Susan Cohen. As Ms. Cohen left the apartment to go to dinner with her fiance, Ms. Borghesani was ironing some clothes.

Ms. Borghesani never appeared at the birthday party. When she failed to appear, her friends instigated a search, and, when they could not find her, they called the police.

Ms. Borghesani's body was found the next morning at the bottom of a stairwell of the Air Force Association building. She was nude "from her midsection down," she had been raped, and her body bore multiple wounds, many inflicted with a weapon having a sharp-tipped blade. Her rings were missing, and earrings "she was

wearing [the night before] had been ripped from her ears.'' One of her shoes was found on the bicycle path. Later that day, her purse was found at the same parking lot where Deborah Abel's purse was found and, like Ms. Abel's, it contained no money.

On August 18, 1990, four and one-half months after the Borghesani murder, Satcher was observed on another bicycle path in Arlington County. He was arrested for offenses he had committed that day. Nothing was said to him concerning the Borghesani rape and murder, but, as he was being transported to police headquarters, he told an officer that the police were ''trying to frame [him] for a murder or something or a rape or something.''

In the glove compartment of Satcher's car, police found an awl.[2] Satcher admitted he owned the awl on the date of the murder. In the medical examiner's opinion, the awl was ''consistent with [Ann Borghesani's] wounds.'' Scientific tests matched semen removed from Ms. Borghesani's body with blood taken from Satcher.

## ISSUES PREVIOUSLY RESOLVED

In a motion filed below, Satcher sought to ''prohibit the imposition of the death penalty against him on the grounds that the Virginia death penalty statutes [violate] the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections Eight, Nine and Eleven of the Constitution of Virginia.'' The trial court denied the motion, and Satcher assigns the denial as error.

All the arguments Satcher makes on appeal in support of the motion have been answered by previous decisions of this Court. He has not advanced sufficient reason to justify a departure from the views previously expressed, and we can perceive of none. Accordingly, we will reaffirm our earlier decisions and reject Satcher's arguments. The arguments Satcher makes and the decisions answering them are as follows:

A. Virginia's ''vileness'' predicate for imposition of the death penalty is unconstitutionally vague as applied and the ''future dangerousness'' predicate is unreliable and vague because the jury's discretion is not limited or guided in any way. Answered by *M. Smith* v. *Commonwealth*, 219 Va. 455, 476-78, 248 S.E.2d 135, 148-49 (1978), *cert. denied*, 441 U.S. 967 (1979).

---

[2] An awl is a pointed tool used to make holes in wood, leather, or other material.

B. Due process is violated by the use of evidence of unadjudicated acts of misconduct to prove ''future dangerousness'' without an instruction requiring proof of such acts beyond a reasonable doubt. Answered by *Stockton* v. *Commonwealth*, 241 Va. 192, 210, 402 S.E.2d 196, 206, *cert. denied*, 502 U.S. ___, 112 S.Ct. 280 (1991).[3]

C. The death penalty is imposed arbitrarily and discriminatorily where, as in this case, the victim is white and the defendant is black. Answered by *Townes* v. *Commonwealth*, 234 Va. 307, 335, 362 S.E.2d 650, 666 (1987), *cert. denied*, 485 U.S. 971 (1988).

D. The death penalty is excessive and repugnant to society's evolving standards of decency and, hence, is violative of the Eighth Amendment's prohibition against cruel and unusual punishment. Answered by *M. Smith*, 219 Va. at 476, 248 S.E.2d at 148.

E. The manner in which the jury receives evidence and instructions on the subject of mitigation is constitutionally improper. Answered by *Watkins* v. *Commonwealth*, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), *cert. denied*, 475 U.S. 1099 (1986).

F. The death penalty statutes are unconstitutional as applied because a defendant cannot secure either a meaningful appellate review of the predicates of ''vileness'' and ''future dangerousness'' or an objective determination whether his sentence is the product of passion and prejudice or is disproportionate to the penalty imposed in similar cases. Answered by *R. Smith* v. *Commonwealth*, 239 Va. 243, 253, 389 S.E.2d 871, 876, *cert. denied*, 498 U.S. 882 (1990).[4]

## PRETRIAL MATTERS

### *Motion for Separate Trials*

By pretrial motion, Satcher sought separate trials of the offenses involving Deborah Abel and those involving Ann Borghesani. After

---

[3] At the sentencing phase, the trial court refused to grant Satcher's proffered Instruction E, which would have told the jury to disregard evidence of other criminal offenses unless they were proved beyond a reasonable doubt. The refusal was not error. In another instruction, the jury was told it was the Commonwealth's burden to prove ''future dangerousness'' beyond a reasonable doubt, and this was sufficient.

[4] Satcher also contends he was denied meaningful appellate review because this Court refused to allow him to submit a brief in excess of the fifty-page limitation fixed by Rule 5:26. We reject this contention as meritless.

argument, the trial court denied the motion. Satcher assigns the denial as error.

■ As pertinent here, Rule 3A:10(b) provides that all offenses pending against an accused may be tried at one time "if justice does not require separate trials and . . . the offenses meet the requirements of Rule 3A:6(b)." Under Rule 3A:6(b), joinder of offenses is permissible if they "are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan."

Satcher argues that the "interests of justice required separate trials because identity was the key issue in both cases" and consolidation "allowed the Commonwealth to take weak identity evidence from two cases in an effort to identify [him] although there was no evidence that the same assailant attacked both women." Furthermore, Satcher says, "the offenses were not connected or part of a common scheme or plan." Hence, Satcher concludes, the denial of his motion for separate trials constituted a violation of Rules 3A:10(b) and 3A:6(b).

■ We disagree with Satcher. From the evidence and the reasonable inferences to be drawn therefrom, it is clear that the two or more acts involved in this case constituted parts of a common scheme or plan and were closely connected in time, place, and means of commission, all of which supports the use of a single trial. The two crimes occurred within a few yards and about one-half hour of each other. Both victims were forcibly removed from the bicycle path at a location concealed behind the "sound barrier wall." In each instance, the victim was brutally beaten and partially disrobed. The criminal intent of the assailant — to commit rape and robbery — was the same in both situations. The purse of each victim was stolen, and the two purses were found in approximately the same location, with only money missing from both.

■ Hence, the requirements for a single trial under Rule 3A:6(b) are satisfied in this case. And, contrary to Satcher's argument that consolidation "allowed the Commonwealth to take weak identity evidence from two cases in an effort to identify [him]," the evidence, as we will demonstrate *infra*, established Satcher as the assailant in both cases with a high degree of certainty. Therefore, Satcher's Rule 3A:10(b) "interests of justice" argument does not stand up. Indeed, on balance, the interests of justice favored trying all the offenses against Satcher in a single trial.

■ Furthermore, Satcher's separate-trial argument is based solely upon the trial court's alleged error in the application of Rules 3A:10(b) and 3A:6(b). However, "[a]n error . . . in the application or interpretation of a Rule of Court will not constitute reversible error unless the substantive rights of a party have been affected." *Foster* v. *Commonwealth*, 6 Va. App. 313, 323, 369 S.E.2d 688, 694 (1988) (citing Rule 3A:2(a)).[5] Hence, misapplication of Rules 3A:10(b) and 3A:6(b) would not constitute reversible error unless the misapplication affected Satcher's substantive rights. And, as we decide *infra*, Satcher's substantive rights would not have been affected because, in a separate trial of Ann Borgehsani's murder, evidence of the offenses involving Deborah Abel would have been admissible.

■ Generally, evidence of other offenses is inadmissible in a criminal prosecution, but there are well-established exceptions. "[E]vidence of similar acts is admissible to show a common scheme, design, or plan where there is 'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" *McWhorter* v. *Commonwealth*, 191 Va. 857, 870-71, 63 S.E.2d 20, 26 (1951) (citations omitted).

> Evidence of other offenses is admitted if it shows the conduct and feeling of the accused toward his victim . . . or if it tends to prove any relevant element of the offense charged. Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial. Also, testimony of other crimes is admissible where the other crimes constitute a part of the general scheme of which the crime charged is a part.

*Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970).

■ "Evidence of other crimes is admissible when it tends to establish a common plan, design, or scheme embracing a series of crimes, including the crime charged, so related to each other that

---

[5] Rule 3A:2(a) reads as follows: "Errors, defects, irregularities or variances that do not affect substantive rights shall not constitute reversible error.'

proof of one tends to prove the other.'' Charles E. Torcia, *Wharton's Criminal Evidence* § 186 (14th ed. 1985). However, for such evidence to be admissible, its probative value must outweigh its prejudicial effect. *Coe* v. *Commonwealth*, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986).

■ Guided by the standards set forth in *McWhorter, Kirkpatrick,* and *Wharton,* we think that the evidence of the Abel offenses would have been admissible in a separate trial of Ann Borghesani's murder and that, compatible with *Coe,* the probative value of such evidence would have outweighed its prejudicial effect. Hence, Satcher's substantive rights were not affected by the trial court's application of Rules 3A:10(b) and 3A:6(b) in its decision to deny separate trials, and no reversible error resulted from that decision.

In the final analysis, ''[w]hether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court.'' *Cheng* v. *Commonwealth*, 240 Va. 26, 33, 393 S.E.2d 599, 603 (1990). We hold that the trial court did not abuse its discretion in denying Satcher's motion for separate trials.[6]

*Motion for Bill of Particulars*

Satcher filed a motion for a bill of particulars, listing ten items upon which information was desired concerning the offenses involving Deborah Abel. Satcher asserted in the motion that the indictments returned against him did not ''inform [him] of the cause and nature of the offenses with which he [was] charged.''

The Commonwealth responded voluntarily by filing a bill of particulars covering five of the items upon which information was requested. The trial court denied the motion with respect to the five remaining items. Satcher contends the trial court erred.

■ We disagree with Satcher. An indictment is sufficient if it gives the accused ''notice of the nature and character of the offense charged so he can make his defense.'' *Wilder* v. *Commonwealth*, 217 Va. 145, 147, 225 S.E.2d 411, 413 (1976). Where, as here, an indictment meets that standard, a bill of particulars is not required. *Ward* v. *Commonwealth*, 205 Va. 564, 569, 138 S.E.2d 293, 296-97

---

[6]*Godwin* v. *Commonwealth*, 6 Va. App. 118, 367 S.E.2d 520 (1988), cited by Satcher, is inapposite. There, the two robberies in issue occurred five days and three and one-half miles apart and ''no evidence linked or connected the one robbery with the other.'' *Id.* at 122, 367 S.E.2d at 522.

(1964); *Tasker* v. *Commonwealth*, 202 Va. 1019, 1024, 121 S.E.2d 459, 462-63 (1961). *Strickler*, 241 Va. at 490, 404 S.E.2d at 233.

## Motion for Discovery

Satcher also filed a motion for discovery concerning the offenses involving Deborah Abel. In Paragraph 13 of the motion, Satcher sought certain information, "pursuant to the rulings in *Brady* v. *Maryland*[, 373 U.S. 83 (1963)]." The trial court denied the motion with respect to items (d), (e), and (f) of Paragraph 13, and these three items are subjects of an assignment of error.

In item (d), Satcher requested "descriptions provided by any witness [differing] from the physical characteristics of the Defendant." During argument below, the prosecutor represented that, pursuant to an "open file discovery" policy his office was observing in the case, he had furnished Satcher "all descriptions that were given of the defendant." Upon the strength of this representation, the trial court denied item (d). We find no error in this action of the trial court.

In items (e) and (f), Satcher requested "any statement or action by any witness . . . indicating that such witness was unable to identify [or was uncertain about his or her identification of] the Defendant as the perpetrator of these offenses." Agreeing with the prosecutor that the information requested in items (e) and (f) would be exculpatory "only if the witness [thought] it was somebody [other than Satcher who committed the offenses]," the trial court denied items (e) and (f). We find no error in this action of the trial court and no *Brady* violation with respect to any of the information sought by Satcher in items (d), (e), and (f).

## GUILT PHASE

### Jury Selection

#### Voir Dire Examination

Satcher contends that the trial court erred in refusing to ask prospective jurors the following question:

[I]f we have a situation in which a young woman is raped, robbed by a person armed with a deadly weapon, stabbed

twenty-one times, beaten and murdered, . . . in that type of situation do any of you believe that the imposition of the death penalty would be the most appropriate sentence?

In *Patterson* v. *Commonwealth*, 222 Va. 653, 657, 283 S.E.2d 212, 214 (1981), defense counsel proposed asking prospective jurors whether they believed ''that the death penalty is ordinarily the proper punishment for the crime of capital murder.'' And in *Buchanan* v. *Commonwealth*, 238 Va. 389, 402, 384 S.E.2d 757, 764 (1989), *cert. denied*, 493 U.S. 1063 (1990), the question proposed was whether prospective jurors believed ''that a death sentence is the only appropriate punishment for capital murder.'' We approved the rejection of both questions. The question proposed here is nearly identical, and we approve its rejection.[7] *See Mueller* v. *Commonwealth*, 244 Va. 386, 400, 422 S.E.2d 380, 386 (1992).

## DNA Bias

Satcher contends the trial court erred in refusing to strike for cause prospective jurors ''who had preconceived opinions concerning the reliability of DNA evidence.'' The refusal to strike these prospective jurors, Satcher says, shifted the burden of proof to the defense.

On *voir dire* examination, Earl Barbee stated that he thought DNA was ''sort of like a fingerprint'' and ''would be pretty accurate.'' Robert Goldman and Bruce Walch said that they were convinced DNA is a reliable form of identification and would have to be convinced of its unreliability. William Gay stated that DNA ''is the same as a fingerprint'' and that he would have to be convinced it was not a reliable means of identification.

We do not think that the trial court erred in refusing to strike these prospective jurors for cause. As the prosecutor observed during argument on Satcher's motion to strike prospective juror Barbee: ''People do not come into juries totally with blank minds. They must come in with some knowledge.''

---

[7] In a recent case, *Morgan* v. *Illinois*, ___ U.S. ___, 112 S.Ct. 2222 (1992), the Supreme Court held that it is error in a capital case to refuse to ask prospective jurors on *voir dire* whether, if they find the accused guilty, they would *automatically* vote to impose the death penalty, no matter what the facts may be. The question proposed by Satcher is quite different from the one at issue in *Morgan*. Hence, *Morgan* is inapposite.

■ As will be demonstrated *infra* in the section of this opinion entitled *Admissibility of DNA Evidence*, both this Court and the General Assembly of Virginia have considered the question whether DNA is a reliable means of identification and both have settled the question in favor of reliability. In stating that they considered DNA evidence reliable, the prospective jurors merely displayed knowledge of a conclusion that is part of the established law of this Commonwealth. Hence, their possession of such knowledge did not disqualify them from service on the jury.

### Predisposition to Death Penalty

Prospective jurors were examined on *voir dire* in groups of four. Defense counsel asked the members of each group the same general question, *viz.*, whether a person who is found guilty of the type of offense with which Satcher was charged should receive the death penalty. Satcher contends that the trial court erred in refusing to strike for cause five prospective jurors, Earl Barbee, Agnes Sulak, Robert Goldman, Angela Lawson, and Ronald Tuttle.[8] Satcher says that all five indicated a predisposition toward imposition of the death penalty.

Prospective juror Barbee said "it depends on the circumstances," whether, for example, the accused had committed murder more than once, and he indicated that, under such circumstances, the defense would have to convince him that the death penalty should not be imposed. Such circumstances did not exist, of course, in Satcher's case. Barbee also said that the Commonwealth would have to prove to him that "the crime was so gruesome that it would require the death penalty."

Prospective juror Sulak stated that she agreed with another prospective juror, one not challenged by Satcher, who said that she was "[n]ot necessarily" disposed toward imposing the death penalty.

---

[8] Satcher also challenged Ronald Tuttle on the ground that, because he had a daughter the same age as the two victims in this case, he could not stand indifferent to the cause. Although Tuttle initially indicated that this similarity in ages would have "some influence on [his] decision-making process," he gave an unequivocal "yes" response to the question whether he could "render [his] decision as to guilt or innocence or [his] decision as to the penalty based on the evidence that [was] presented to [him] no matter how [he] might feel about it." The trial judge indicated his belief that Tuttle could "set aside [his] feelings and render a verdict based on the evidence and on the instructions." We find no error in the trial court's refusal to exclude Tuttle on the ground that the similarity of his daughter's age disqualified him.

When pressed by defense counsel to say whether she was predisposed, Sulak replied that "[i]t would depend."

Prospective juror Goldman stated that, considering the facts in Satcher's case as detailed by defense counsel, he would have to be given "some other factors to convince [him] that the death penalty should not be imposed." But Goldman indicated he did not believe that "every person who has been convicted of murder should receive the death penalty." And when asked whether he would be "predisposed towards imposing the death penalty" under the facts of Satcher's case, he said "[i]t depends on the facts."

Prospective juror Tuttle said "[i]t depends on the instructions that the Judge would give, what were the guidelines in the law." He stated further that "if [the death penalty is] deserved, yes[, he] would impose [it]," but his opinion was not so strong that he would carry "a picket sign" in front of the courthouse. And he said it was not his belief that the death penalty was "the only appropriate punishment."

Prospective juror Lawson said "[i]t depends on the situation." When asked by defense counsel whether, in cases like Satcher's, she would be "predisposed towards imposing the death penalty," she replied in the affirmative. But she immediately indicated she would have no difficulty in deciding that life imprisonment was the appropriate punishment in "any type of murder."

Indeed, in making this latter commitment, Lawson joined the other four prospective jurors in question, who also indicated that they would have no difficulty in deciding that life imprisonment was an appropriate punishment in any type of murder. And all five prospective jurors indicated that they could consider evidence in mitigation, that is, evidence used to convince them that death is not the appropriate punishment.

In addition, all five prospective jurors indicated that their views concerning the death penalty would not affect their ability to render an impartial verdict on the issue of guilt or innocence. All five indicated that, if the jury found Satcher guilty, they could follow the court's instructions concerning the necessity for the Commonwealth to prove the aggravating factors of "future dangerousness" or "vileness" before the death penalty could be imposed. All five indicated that they were unaware of "anything at all" which would affect their ability to render a fair and impartial verdict on the issue of guilt or innocence.

 Furthermore, all five prefaced their views about imposition of the death penalty with the cautionary expression, "it depends." And, with respect to all five, the trial court expressed confidence in their ability to follow the court's instructions, to stand indifferent to the cause, and to render a fair verdict.

As an appellate court, we must give deference to the trial court's decision whether to retain or exclude individual veniremen because the trial court "sees and hears the juror." *Wainwright* v. *Witt*, 469 U.S. 412, 426 (1985); *accord Spencer* v. *Commonwealth*, 238 Va. 563, 572, 385 S.E.2d 850, 855 (1989), *cert. denied*, 493 U.S. [1093], 110 S.Ct. 1171 (1990) (*Spencer III*); *O'Dell* v. *Commonwealth*, 234 Va. 672, 693, 364 S.E.2d 491, 503, *cert. denied*, 488 U.S. 871 (1988). For that reason, the trial court's decision in that regard will not be disturbed on appeal absent a showing of "manifest error." *Spencer IV*, 240 Va. at 94, 393 S.E.2d at 619.

The standard to be applied by the trial court in determining whether to retain a venireman on the jury panel is whether his answers during *voir dire* examination indicate to the court something that "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams* v. *Texas*, 448 U.S. 38, 45 (1980); *accord Turner* v. *Commonwealth*, 234 Va. 543, 549, 364 S.E.2d 483, 486, *cert. denied*, 486 U.S. 1017 (1988); *O'Dell*, 234 Va. at 695, 364 S.E.2d at 504.

*Eaton* v. *Commonwealth*, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), *cert. denied*, 502 U.S. ___, 112 S.Ct. 88 (1991).

We discern nothing in the record to indicate that the trial court failed to observe this standard in deciding that the five prospective jurors were not predisposed toward imposing the death penalty; indeed, "[t]he record gives every indication that [before reaching a decision] the trial judge gave close and conscientious attention to the demeanor of the veniremen." *Spencer IV*, 240 Va. at 94, 393 S.E.2d at 618. We cannot say, therefore, that there is manifest error in the trial court's decision to retain the five veniremen.

## Prospective Juror Middle

Herbert Middle stated on *voir dire* that his son-in-law was an Arlington County policeman and that he was friendly with other county police officers. Initially, Middle admitted "[i]t's a possibility" that his relationship with police officers "might cause [him] to give more weight to their testimony than [he] might give to someone that [he did not] know," and he asked to be excused from service on the jury.

 Middle indicated, however, that he had not discussed Satcher's case with his son-in-law and had not reached an opinion concerning Satcher's guilt or innocence. Middle said he "would have to weigh [the testimony of police officers] for [himself] and find out [who was giving the accurate testimony]." He also said he would "weigh the facts of both sides," and he responded affirmatively to the trial judge's question whether he would "make [his] decision based on [the evidence]; not because [he] may or may not know somebody." He also responded "[r]ight" to the judge's question whether he could "stand indifferent to this cause." Under these circumstances, we cannot say there is manifest error in the trial court's refusal to strike Middle for cause.

## Prospective Juror Oppenheimer

 The trial court dismissed Michelle Oppenheimer as a prospective juror because she stated on *voir dire* that she "could not honestly take [the] oath [as a juror] if . . . it would require [her] to support the death penalty." Satcher contends the court's action "constituted a violation of [his] right to a fair and impartial jury."

We disagree with Satcher. Ms. Oppenheimer clearly indicated that her "views'would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *O'Dell*, 234 Va. at 695, 364 S.E.2d at 504 (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 (1980)). Accordingly, the trial court did not err in dismissing Ms. Oppenheimer.

## Alternate Jurors

Before jury selection began, the trial court and counsel agreed that twenty-four persons would be empaneled, from which each side would strike five, and that the remaining fourteen would hear all the

evidence. It was further agreed that when both sides had rested, two jurors would be excused, leaving twelve to deliberate. The trial court ruled that the two jurors to be excused would be selected at random.

On the first day of trial, before the jurors were sworn, one of the fourteen became ill and was excused. The trial court ruled that the trial should proceed and that, when the evidence was concluded but before deliberations began, one juror, to be selected at random, would be excused. Satcher then moved to strike the entire panel and to select a new one. The trial court denied the motion, finding that "any further delay at this point is unreasonable and unnecessary."

Satcher asserts that the defense exercised its peremptory challenges in reliance upon the participation of a panel of fourteen. He argues that, when the ill juror was excused, "the trial court abused its discretion by not allowing the defense to either . . . add another juror through a separate voir dire procedure . . . or . . . dismiss the jury and allow the parties to choose another fourteen." Satcher concludes that the trial court's action "violated the spirit of *Swain v. Alabama*, 380 U.S. 202 (1965) 'which cautions that the right to one's peremptory challenges shall not be impaired.'"

 We disagree with Satcher. He does not question the trial court's action in excusing the ill juror. And, as he acknowledges, the manner of proceeding under the circumstances was a matter for the exercise of the trial court's discretion. We cannot perceive of any prejudice Satcher may have suffered from the trial court's action, and we are unable to find any abuse of discretion on the court's part. Hence, we reject Satcher's argument on the subject.

## *DNA Evidence*

### Reliability

Semen removed from the body of Ann Borghesani and a sample of Satcher's blood were subjected to DNA analysis. DNA is an abbreviation for the term deoxyribonucleic acid.

DNA, the active substance of the genes, carries the coded messages of heredity in every living thing: animals, plants, bacteria, and other microorganisms. In humans, the code-carrying DNA occurs in all cells that have a nucleus, including

white blood cells, sperm, cells surrounding hair roots, and cells in saliva.

Human genes are carried in 23 pairs of chromosomes, long threadlike or rodlike structures that are a person's archive of heredity. Those 23 pairs [are] the total genetic makeup of a person . . . .

National Research Council, *DNA Technology in Forensic Science* S-1 (1992).

Except for identical twins, the DNA of a person is for practical purposes unique. That is because one chromosome of each pair comes from the father and one from the mother . . . .

*Id.* at S-2.

Testimony adduced below showed that chromosomes are composed in part of DNA molecules. In DNA "printing" or "typing," DNA molecules are chemically extracted from biological specimens such as semen or blood. The molecules are subjected to a procedure using "restriction enzymes," which "cut the DNA" and produce "hundreds and hundreds of [DNA] fragments that are . . . all different sizes."

The next step is known as electrophoresis, which employs a medium "very similar to Jello in nature" and which separates and arranges the different sized fragments according to their lengths. A nylon membrane is then placed over the Jello-like medium and the DNA fragments "actually migrate" into the membrane, after which chemicals transform "the double-stranded DNA molecule . . . into a single-stranded molecule."

Next, a DNA "probe," which is "a short section of single-stranded DNA" with radioactive material attached to it, is applied to the fragments. The probe "look[s] across all the hundreds of different fragments . . . and attach[es] itself to [a particular] fragment." The membrane is put in contact with x-ray film, resulting in a band or bands representing the spot where light was given off when the probe attached itself to the fragment. Any excess probe is washed off, and an autoradiogram, or autorad, is produced.

The autorads are examined, and a comparison is then made of the banding patterns of a sample of body fluid found at a crime scene

with the patterns of a specimen extracted from a suspect. Four different probes are used to determine, for example, whether a semen sample found on the clothing of a rape victim matches the blood of a particular suspect. A match occurs when the bands of the two specimens are in the same position.

If a match is found, the next step is to determine "how often is this particular pattern seen in the caucasian population and how often is it seen in the black population." This determination is made for each of the four probes that are performed, and then "an overall profile frequency" is calculated. The purpose of the exercise is to eliminate large parts of the population until all the probes are exhausted and a determination can be made of "how likely is it to see someone with a pattern that matches this particular [specimen]."

Richard A. Guerrieri, a forensic serologist employed by the Commonwealth at the Tidewater Regional Crime Laboratory in Norfolk, conducted DNA analysis of the semen sample removed from the body of Ann Borghesani and the blood taken from Satcher. Guerrieri testified at trial that the DNA profiles obtained from the semen sample matched the DNA profiles of Satcher's blood. Guerrieri testified further that each of the four probe tests matched the semen sample with the blood of Satcher, and that the four tests resulted in the overall elimination of 99.999998% of the black population.

Guerrieri also stated that "the probability of randomly selecting an unrelated individual from the black population with the DNA profile matching Mr. Satcher's is approximately one in forty million." In conclusion, Guerrieri estimated there are about fifteen million black males in the United States, and he expressed the opinion that the tests he performed would eliminate all but Satcher as the person who donated the semen removed from the body of Ann Borghesani.[9]

■ Satcher's contentions raise the question whether DNA testing is a reliable scientific technique. However, as we indicated *supra*, that question has already been settled in Virginia. It was first settled in a series of cases decided by this Court, all involving one

---

[9] Satcher contends that the trial court should not have permitted Dr. Guerrieri to testify about "statistics, population genetics and probabilities when he had no expertise in these areas." However, whether a witness is qualified as an expert "lies largely in the discretion of the trial court, whose judgment will not be reversed unless it clearly appears that the witness was not qualified." *Ames & Webb, Inc.* v. *Commercial Laundry*, 204 Va. 616, 621, 133 S.E.2d 547, 550 (1963). We find no abuse of discretion in Satcher's case.

Timothy Wilson Spencer: *Spencer* v. *Commonwealth*, 238 Va. 275, 384 S.E.2d 775 (1989), *cert. denied*, 493 U.S. 1036 (1990) (*Spencer I*); *Spencer* v. *Commonwealth*, 238 Va. 295, 384 S.E.2d 785 (1989), *cert. denied*, 493 U.S. 1093 (1990) (*Spencer II*); *Spencer* v. *Commonwealth*, 238 Va. 563, 385 S.E.2d 850 (1989), *cert. denied*, 493 U.S. 1093 (1990) (*Spencer III*).[10]

Satcher gives the *Spencer* decisions no credence, dismissing them with the curt statement that "*the defense [in those cases] produced no evidence to controvert the Commonwealth's claim of reliability,* a fact that was central to the Court's finding of admissibility." (Emphasis in original.) However, the cases cannot be dismissed so lightly. In *Spencer III*, we said:

> In the present case, the undisputed evidence established that the DNA print identification test was properly conducted. Spencer contends, however, that the trial court erred in admitting into evidence the results of the DNA print identification test "because the Commonwealth failed to establish its reliability and its general acceptance in the scientific community." Spencer contended the same in *Spencer I* and *Spencer II*. In those cases, in which the issue was one of first impression, *we held that DNA testing is a reliable scientific technique.* 238 Va. at 290, 384 S.E.2d at 783; 238 Va. at 315, 384 S.E.2d at 797. We adhere to those holdings.

238 Va. at 573, 385 S.E.2d at 855-56 (emphasis added) (footnotes omitted). We reiterate our adherence to the *Spencer* rule that DNA testing is a reliable scientific technique.

■ The question concerning the scientific reliability of DNA testing has also been the subject of action by the General Assembly. Following our *Spencer* decisions, the General Assembly enacted Code § 19.2-270.5 at its 1990 session. The section provides as follows:

> In any criminal proceeding, DNA (deoxyribonucleic acid) testing shall be deemed to be a reliable scientific technique and the evidence of a DNA profile comparison may be admitted to

---

[10] In a fourth case, *Spencer* v. *Commonwealth*, 240 Va. 78, 393 S.E.2d 609, *cert. denied*, 498 U.S. 908 (1990) (*Spencer IV*), the DNA samples were too degraded in quality to permit analysis by the usual DNA methodology and a process known as PCR DNA amplification was used.

prove or disprove the identity of any person. This section shall not otherwise limit the introduction of any relevant evidence bearing upon any question at issue before the court. The court shall, regardless of the results of the DNA analysis, if any, consider such other relevant evidence of the identity of the accused as shall be admissible in evidence.

### Facial Unconstitutionality of Code § 19.2-270.5

Satcher contends that Code § 19.2-270.5 is unconstitutional on its face because it creates an "evidentiary presumption that impermissibly shifts the burden of proof." We disagree with Satcher. The word "deem" has more than one meaning, and "[i]ts meaning is often dependent upon the circumstances in connection with which it is used." *Miller* v. *Commonwealth*, 172 Va. 639, 649, 2 S.E. 2d 343, 347 (1939).

Here, the word "deemed" must be read in the context of the language of Code § 19.2-270.5 that evidence of a DNA profile *may* be admitted and that the Code section shall not otherwise limit the introduction of *any relevant evidence* bearing upon *any question at issue*. When so read, "deemed" becomes synonymous with "considered" or "treated as if," *Black's Law Dictionary* 415 (6th ed. 1990), meaning that DNA testing shall be considered or treated as a reliable scientific technique. When given this meaning, Code § 19.2-270.5 neither creates a presumption nor shifts the burden of proof. "It merely creates a rule of evidence and does not determine the guilt of the accused." *Dooley* v. *Commonwealth*, 198 Va. 32, 35, 92 S.E.2d 348, 350 (1956).

### Unconstitutional Vagueness of Code § 19.2-270.5

Satcher also contends that Code § 19.2-270.5 is "unconstitutionally vague" because "it allows excessive discretion to judges in its application." As noted in the preceding section, however, all the General Assembly has done is to establish a rule of evidence, and judges are well-versed in administering rules of evidence without explicit guidance from the legislature. Furthermore, the administration of this particular rule should be relatively problem-free — the resolution of "any question at issue before the court" will require the application of the law to the facts by a judge or jury, aided by the testimony of expert witnesses.

## As-Applied Unconstitutionality of Code § 19.2-270.5

Satcher contends further that Code § 19.2-270.5 is unconstitutional as applied to him because it "allowed the Commonwealth to violate his rights of due process, confrontation and a fair trial." Here, Satcher argues the trial court admitted the DNA test results "in the face of undisputed evidence that [they] were unreliable" and, hence, the DNA evidence was more prejudicial than probative.

Satcher cites the testimony of one of his expert witnesses, Dr. Ronald T. Acton, given during an *in camera* hearing conducted by the trial court to determine whether the DNA evidence was admissible. Dr. Acton testified that the DNA methodology currently in use can result in mixed samples and laboratory errors, that two different laboratories may come up with two different results, and that the data base used to calculate the probability of a random match failed to reflect accurately "the frequency of the genes in the relevant population." Satcher also cites the testimony of another of his experts, Dr. Lawrence Dochet Mueller, who said that the data base used in Satcher's case was unreliable because it did not take into account the existence of subpopulations.[11]

Dr. Acton also testified, however, that he found no evidence that any errors or mixing of samples had occurred in the testing of Satcher's DNA. And both of Satcher's experts testified that other experts in the field disagreed with their views about the necessity to recognize subpopulations in the data base used to calculate the probability of a random match. Dr. Mueller testified further that the "product rule," used to calculate the probability of a random match in Satcher's case, is the same rule the forensic community follows and that the community "has decided to assume that subgroups are not in issue."

At the conclusion of the *in camera* hearing, the trial judge observed as follows: "The Court can say without reservation that the probative value of all of the experts in this case with respect to DNA evidence should . . . go to the Jury and its effect outweighs

---

[11] Satcher contends the trial court improperly permitted the prosecutor to question Drs. Acton and Mueller on cross-examination about whether they had conducted their own tests to eliminate the possibility that Satcher's blood had been mixed with someone else's in the DNA analysis made in this case. Satcher says "[t]his impermissibly suggested to the jury that the defendant was required to prove his own innocence." We disagree. We think the prosecutor's questions constituted fair cross-examination. Furthermore, the trial court clearly instructed the jury that the burden was upon the Commonwealth to prove Satcher's guilt.

any prejudicial effect that it may have on the Jury.'' We think the trial judge was correct both in ruling that the DNA evidence should go to the jury and that the evidence was more probative than prejudicial.

> Wide discretion must be vested in the trial court to determine, when unfamiliar scientific evidence is offered, whether the evidence is so inherently unreliable that a lay jury must be shielded from it, or whether it is of such character that the jury may safely be left to determine the credibility for itself.

*Spencer* v. *Commonwealth*, 240 Va. 78, 98, 393 S.E.2d 609, 621, *cert. denied*, 498 U.S. 908 (1990) (*Spencer IV*).

### Rulings Concerning Expert Witnesses

Satcher complains that the trial court permitted the Commonwealth to introduce testimony in violation of a ''DISCOVERY AGREEMENT'' entered into between the Commonwealth's Attorney and defense counsel. The agreement provided that the prosecution and the defense would ''exchange the names, addresses, telephone numbers and curricula vitae of any expert witnesses engaged to investigate and/or testify as to the use or interpretation of DNA analyses.''

Satcher first contends that, in violation of the agreement, the trial court allowed the prosecution to introduce the expert testimony of Dr. Paul B. Ferrara, Director of the Virginia Division of Forensic Science, when the Commonwealth had not furnished the witness's curriculum vitae to the defense. We think, however, that the trial court correctly treated Dr. Ferrara as a factual witness not subject to the curriculum-vitae provision.

But, Satcher maintains, if Ferrara was a factual witness, then he was allowed to testify in violation of the trial court's rule that all witnesses except experts should be excluded from the courtroom. Satcher agrees that we cannot reverse the trial court's action in permitting Ferrara to testify unless it appears that Satcher was prejudiced by such action. *See Bennett* v. *Commonwealth*, 236 Va. 448, 465-66, 374 S.E.2d 303, 314 (1988), *cert. denied*, 490 U.S. 1028 (1989). The trial court specifically found that ''no harm

resulted from [Ferrara's] presence . . . in [the] court[room]." Having examined the record, we hold that the trial court did not abuse its discretion in permitting the witness to testify.

Satcher's next complaint involves Dr. Keven McElfresh, an employee of LifeCodes Corporation, which reproduced "the on-line database [used to calculate the probability of a random match] in this case." Satcher summoned Dr. McElfresh as a witness, put him on the stand during the case for the defense, and merely asked him whether he was the custodian of the data base. When the prosecutor asked McElfresh on cross-examination whether he was familiar with "the nature of that database," defense counsel objected on the ground that the question went beyond the scope of the direct examination.

When the prosecutor stated that he would make McElfresh his witness, defense counsel objected on the ground that the prosecution had not furnished the defense with the witness's curriculum vitae. The prosecutor agreed to furnish the curriculum vitae forthwith and announced that he would recall Dr. McElfresh during the Commonwealth's case in rebuttal. Two days later, the witness returned to the stand, and the trial court allowed him to testify on behalf of the Commonwealth as a DNA expert.

Satcher argues that, because "Dr. McElfresh's curriculum vitae were given to the defense only two days before he was called as the Commonwealth's expert on rebuttal," his testimony violated the discovery agreement and denied Satcher due process of law. We disagree. In the first place, we do not think that a party who has himself summoned a witness is in any position to require his opponent to furnish him with a copy of the witness's curriculum vitae. Be that as it may, Satcher has not demonstrated that he was prejudiced in any manner because he was furnished the information "only two days" before McElfresh testified.

Satcher also complains that, when Dr. McElfresh testified on redirect examination during the Commonwealth's rebuttal, the trial court improperly allowed him to "bolster [his] own credibility with hearsay testimony, denying Mr. Satcher due process of law." Satcher argues that the trial court erroneously permitted Dr. McElfresh to name other experts who agreed with his view that it is unnecessary to include subpopulations in the data base used to calculate the probability of a random match of samples in DNA analysis.

Satcher argues that the trial court's action was contrary to our holding in *Todd* v. *Williams*, 242 Va. 178, 409 S.E.2d 450 (1991). In *Todd*, a medical malpractice case, we held it was error to allow an expert witness to state that he had spoken to two national authorities and that they agreed with his view that a particular procedure was unnecessary in the type of case there on trial.

*Todd*, however, is inapposite; the situation in the present case does not even remotely resemble *Todd*. At one point in a vigorous cross-examination of Dr. McElfresh, defense counsel asked: "So that anybody who is advocating population studies involving subgroups, you disagree with them?" At another point, defense counsel asked: "I assume that you disagree with anyone who suggests that we not use any data until these subgroups have been assessed?" In both these questions, defense counsel implied that a body of experts would disagree with Dr. McElfresh about the use of subpopulations or subgroups and clearly opened the door for McElfresh to name on redirect examination other experts who agreed with his views.[12]

Defense counsel opened the door even wider for similar redirect examination of Dr. Neil Risch, another DNA expert the Commonwealth called during its case in rebuttal. While Risch was under cross-examination, defense counsel said to him: "Well, we've gone through some [experts] that disagree with you —Doctor Cohen, Doctor Taylor, Doctor Lynch, Doctor Greene, Doctor Lander, Doctor Hurdle." Risch then asked defense counsel: "Would you like me to name the ones on the other side?" The trial judge remarked that "[the prosecutor] is going to ask" about other experts, and defense counsel said: "Let him. I'll ask, as he does it, to compare them in preeminence to Lander, Hurdle —."

When Dr. Risch said he "would be happy" to "start naming people of equal or . . . greater stature," defense counsel named two persons and told Risch to "leave [them] out." When the trial judge asked who the two persons were, defense counsel said he was

---

[12] Satcher also contends that the trial court erred in allowing Dr. John Edward Spence, another expert called by the Commonwealth, to testify because "[t]he defense did not receive Dr. Spence's curriculum vitae until the day before the trial began, and [was] not even told that he was being called as an expert at trial until that time." However, defense counsel conceded that the prosecutor had advised the defense "a couple months [before trial] that [the Commonwealth] may call a Dr. Spence," and Satcher has not demonstrated any prejudice that resulted from his having received the curriculum vitae only one day before trial.

"going to object to this." The court overruled the objection, and Risch named six persons. We think that the objection was properly overruled; defense counsel was attempting to play "cat and mouse" with the court, and the court's action in thwarting the attempt was fully justified.[13]

■ Finally, Satcher contends that the trial court improperly allowed the prosecutor to cross-examine Myron T. Scholberg, a hair analysis expert called by the defense, about whether a pubic hair found on Ann Borghesani's body could have been "transferred from the ground to the victim" or "whether [it] could have been a hair from a previous sexual partner of [Satcher]." Scholberg had testified on direct examination that a negroid hair removed from the victim's body differed in its microscopic characteristics from hairs removed from Satcher and, hence, "could not have originated" from him.

Scholberg also testified on direct examination, however, that "[h]airs are not a positive means of identification" and that he could "never say that . . . hairs originated from a certain individual to the exclusion of all other people in his or her race group." Given the ambivalent nature of Scholberg's testimony on direct, we think the prosecutor's questions constituted fair cross-examination.

### Admissibility of Deborah Abel's Identification

Deborah Abel was the first witness for the Commonwealth at trial. She was asked whether the person who attacked her was in the courtroom. She replied affirmatively, and pointed to Satcher. When she stated that she had observed Satcher in the courtroom during the two days of jury selection, Satcher objected to "any testimony concerning . . . an in-court show-up of one person." Satcher argued that the identification was in violation of "the discovery agreement in this case" and was "overly suggestive." The trial court overruled the objection, and Satcher assigns error to the ruling.

■ On appeal, Satcher argues that the discovery agreement was violated because his counsel "did not receive any notice that Ms. Abel had identified the Defendant as her assailant." Satcher does

---

[13] Satcher contends that Dr. Risch should not have been permitted to testify at all because he "consistently refused to return defense counsel's calls before the trial began" and, hence, was not available to the defense "for discovery purposes." Satcher does not tell us what he was entitled to discover from Dr. Risch, but, in any event, no claim is made that Risch's unavailability resulted from any action of the Commonwealth or its agents.

not point out the provision of the discovery agreement he contends was violated, and we have been unable to find one requiring the Commonwealth to give defense counsel notice that someone had identified Satcher. The closest provision we have found is one set forth, not in the discovery agreement, but in a consent order. The provision requires that

> upon written notice *to the Commonwealth* that identity may be a trial issue the Commonwealth shall permit the defendant to inspect, copy and/or photograph:

> . . . .

> (c) For each witness who at trial will identify the defendant as the perpetrator, all photographic arrays shown the witness and descriptions and all photographs of line-ups or show-ups in which the defendant was identified[.]

(Emphasis added.) If there is some other provision relative to notice we have been unable to discover, we will afford the trial court a presumption of correctness in its decision to overrule Satcher's objection based upon that provision. And, if no other provision exists, we must assume defense counsel's memory is faulty.

On the subject of suggestiveness, Satcher argues that Ms. Abel's in-court identification was highly suggestive because she "came to court and observed the Defendant knowing that he was the man charged with the offenses against her and she knew who he was because he was the only black man in that part of the courtroom." Satcher says that the unreliability of this identification is clearly established when it is examined in light of the five factors listed in *Neil* v. *Biggers*, 409 U.S. 188, 199-200 (1972), for evaluating the likelihood of misidentification. The five factors, as well as Satcher's arguments and our discussion with respect thereto, are as follows:

The first two factors involve the opportunity of the witness to view the criminal at the time of the crime and the witness's degree of attention. Satcher says that Ms. Abel had but little opportunity to view her assailant at the time of the attack and gave only slight attention to his appearance.

However, Ms. Abel testified that she first saw the person who turned out to be her assailant when he was between 30 and 50 feet away from her on the bicycle path, that she looked at him "a few

times," and that she made "eye contact" with him when they passed one another, at which time they were "very close," not "even . . . two feet" apart. Although she conceded her eyeglasses came off when she was knocked from her bicycle, she said she was "able to see him when they were on."

And, importantly, she testified that, before she identified Satcher in the courtroom, she observed "the way he walked, the way he shrugged his shoulders when he would come back from the bench," and "it would . . . remind [her] of . . . that night . . . [a]nd . . . him coming down the path exactly . . . the same way he would walk back to his chair in this [court]room."

The third factor relates to the accuracy of the witness's prior description of the accused. Satcher maintains that Ms. Abel's prior descriptions of her assailant were not accurate in that her statements concerning his height, weight, build, facial hair, scars, and age differed from his actual physical characteristics and because a sketch of the assailant prepared by a police department artist from Ms. Abel's description "did not resemble [Satcher] in any way."

It would have been unusual, however, had Ms. Abel's description of her assailant matched Satcher's physical characteristics in every detail; in any event, the differences between her description and Satcher's actual appearance went to the weight, not the admissibility, of her identification evidence. And the statement that the artist's sketch "did not resemble [Satcher] in any way" is unsupported by the record. Indeed, Ms. Abel testified that Satcher "looked extremely close . . . to the picture" she "had helped the artist draw."

The fourth factor concerns the level of certainty demonstrated by the witness at the confrontation. Satcher asserts that Ms. Abel's level of certainty was low because, approximately two weeks before trial, she viewed Satcher and five other persons in a lineup and selected "a person other than the Defendant as the man who attacked her."

What Ms. Abel actually did after viewing the lineup, however, was to ask "number two and number four to come out again and stand and turn around a few times for [her]." When asked at trial whether she was "able to positively identify any of the individuals in that line-up," she replied: "Well, number four, I had decided in my mind, looked extremely close . . . to the picture that I had . . . helped the artist draw." She explained that No. 2 looked "very unthreatening" and she felt that the man who passed her "that night

. . . looked unthreatening.'' But she said that No. 4, who happened to be Satcher, "looked . . . almost identical to the picture.''

Furthermore, Mark Polemani viewed the lineup separately, and he also selected No. 4 as probably the man he had seen on the night in question, but he was not positive. He was not asked to identify Satcher at trial.

Of the most significance on the subject of Ms. Abel's level of certainty, however, is the fact that her in-court identification of Satcher was unequivocally positive. It is also important that Ms. Abel made the identification on her own; there is not the slightest indication that any agent of the Commonwealth had anything to do with staging a "show-up" or other scenario designed to produce the identification.

The final factor deals with the length of time between the crime and the confrontation. Satcher accurately states that a considerable length of time — approximately fifteen months —elapsed between the time the crime occurred and the time Ms. Abel made her in-court identification. But the lapse of time alone is not sufficient to render an identification unreliable as a matter of law.

Rather, whether an identification is reliable "depends on the totality of the circumstances.'' *Stovall* v. *Denno*, 388 U.S. 293, 302 (1967). Considering the totality of the circumstances in this case, we have no difficulty in saying that Ms. Abel's in-court identification of Satcher was reliable.

### Admissibility of Evidence Concerning Rings

Evidence showed that Ann Borghesani wore two rings "all the time.'' The rings were missing from her body when it was discovered the morning after the murder.

One of the missing rings was a class ring from Tufts University, Ann Borghesani's alma mater. The defense put on the testimony of Kurt William Kruger, who operated a consignment shop in Fairfax County. He said that, about a month after the murder, two white females in their mid-twenties attempted to sell him a class ring bearing Ann Borghesani's initials. In rebuttal, the Commonwealth introduced, through Ann's mother, a copy of an order form for the ring, which Ann had filled out in her mother's presence and which had been retained among the family's records. The form called for a ring bearing the first name "Ann,'' the middle initial "E,'' and the last name "Borghesani.''

Satcher argues that the order form constituted inadmissible hearsay. He says it does not qualify under the business records exception to the hearsay rule, and he claims its admission was prejudicial because it "contradicted defense evidence that someone with no connection to him had been attempting to sell jewelry taken from Ann Borghesani."

We will assume, without deciding, that the order form was not admissible under any exception to the hearsay rule. However, we think that the admission of the form, if error, was harmless error.

▮ The defense claim of prejudice is dependent upon the validity of the premise that "someone with no connection" to Satcher attempted to sell the ring. That premise, however, is based upon assumption rather than fact. All the record shows is that two white females in their mid-twenties attempted to sell the ring. To say they had no connection to Satcher would be pure speculation. No prejudice can result from the admission of evidence which is claimed to contradict a fact that has not been established in the first place.

### Cross-Examination of Satcher

Satcher took the witness stand in his own defense. On direct examination, he testified that he lived in Washington, D.C., on the date of the murder, that he did not remember what he was doing on the evening the murder occurred, that the awl the police found in his car was used to repair the vehicle, that he did not attack Deborah Abel, and that he did not attack and murder Ann Borghesani.

On cross-examination, the prosecutor, without objection, asked Satcher several questions concerning his whereabouts on the day of the murder, whether he worked on that day, and whether he was familiar with the location where the crimes occurred. But, when the prosecutor asked Satcher whether he was familiar with the bicycle paths in Arlington County and whether he knew before he was arrested that he was a suspect in the Abel and Borghesani cases, defense counsel objected on the ground the questions exceeded the scope of the direct examination. The trial court overruled the objection, and Satcher assigns the ruling as error.

On appeal, Satcher argues that the trial court erred in permitting the prosecutor to cross-examine him on matters that exceeded the scope of the direct examination. He also argues that the error was

compounded by admission of rebuttal evidence concerning issues first raised during his cross-examination by the Commonwealth.

We disagree with Satcher. When he took the witness stand and denied complicity in the offenses then on trial, he opened the door for any questions on cross-examination that the trial court, in the exercise of its discretion, might find relevant to the issue of guilt or innocence. *See Bunch* v. *Commonwealth*, 225 Va. 423, 438, 304 S.E.2d 271, 279-80, *cert. denied*, 464 U.S. 977 (1983).

Furthermore, Satcher's denial of complicity on the witness stand also opened the door for rebuttal evidence contradictory of the denial, the scope thereof and whether presented in the proper order being subject to the exercise of the trial court's discretion. *See Quintana* v. *Commonwealth*, 224 Va. 127, 142, 295 S.E.2d 643, 650 (1982), *cert. denied*, 460 U.S. 1029 (1983); *Hargraves* v. *Commonwealth*, 219 Va. 604, 608, 248 S.E.2d 814, 816-17 (1978). Finding no abuse of discretion on the trial court's part in either the cross-examination of Satcher or the admission of evidence in rebuttal, we reject Satcher's argument on the subject.

### Admissibility of Joyce Ann Bern's Identification

Joyce Ann Bern lived in a condominium facing a bicycle path in a section of Arlington County located some distance from the scene of Ann Borghesani's murder. On August 18, 1990, about four and one-half months after the murder, Ms. Bern was cleaning out the trunk of her car when she was "about knocked . . . down" by a man who ran "right off the bike trail." It was mid-day at the time, and Ms. Bern observed the man's face for two to five seconds. She also noted that he was wearing red jogging pants, an off-white shirt with faded red writing on it, and a "black fanny belt."

After almost knocking Bern down, the man "just kept on running . . . up to the back of the apartments" where "you can cut across . . . and . . . go over to Four Mile Run." In a minute or two, a woman "came up off the bike trail" with "skinned knees and everything." The woman, who was later identified as Regina Overholt, said "she had been attacked down on the bike trail" and asked to use Ms. Bern's telephone to call the police.

When police officers arrived, they drove Ms. Bern "down off of Four Mile Run and George Mason Drive," a distance equivalent to a ten minute walk from her home. There, she saw a lone black man

in the person of Michael Satcher. He was surrounded by a number of people, most of whom were not in police uniform.

Ms. Bern remained in the police car, as far from Satcher as the distance from the witness stand to "the back wall of the courtroom." Only fifteen to twenty minutes had elapsed since Ms. Bern's encounter with the man at the trunk of her car.

During an *in camera* hearing held to determine the admissibility of Ms. Bern's identification, she testified that, when she arrived at the Four Mile Run location, the police asked her, "is this the man?" She said she was not sure because "he had taken his shirt off," and she asked the police "to put the shirt back on him." Satcher put his shirt on, and Ms. Bern said, "[y]es, that looks like the man." She also said that, while she "was not certain, . . . it sure [would be] a coincidence for [another] man to be wearing the same clothes." And she indicated that, "after they put the shirt on him," there was no "question in [her] mind" that Satcher was the person she saw "running by [her]."

Over Satcher's objection, the trial court permitted Ms. Bern to testify during the Commonwealth's rebuttal in the guilt phase. There, she positively identified Satcher as the person she saw running from the bicycle path on August 18, 1990.

In the sentencing phase, Ms. Bern was permitted to testify about the whole sequence of events in which she was involved with Satcher on August 18. On cross-examination by defense counsel, she indicated some uncertainty about her identification of Satcher. She testified that she could not say "positively" Satcher was the man who ran past her "but it would have to be one out of a hundred that [two people] are going to dress the same way." And, importantly, she replied, "[y]es, ma'am" when asked on redirect examination whether she had identified Satcher at his preliminary hearing "as the one who ran by [her] that morning."

Satcher contends the trial court erred in permitting Ms. Bern to testify. He argues that the "showup procedure in which Ms. Bern identified Mr. Satcher was unduly suggestive and totally unreliable" — she saw him for only a few seconds, her attention was not focused on him, she was uncertain of her identification, and she identified the clothes rather than the person.

We disagree with Satcher. We think this case is controlled by our decision in *Martin* v. *Commonwealth*, 210 Va. 686, 173 S.E.2d 794 (1970). In that case, the victim was beaten by two men in an attempted robbery about 2:00 a.m. one morning. The two assailants

fled the scene. Fifteen or twenty minutes after the offense occurred, the police took the victim to a location approximately six blocks from the crime scene. There, another police officer had stopped two subjects who matched the description the officer had received over the radio. The victim remained seated in the police cruiser, some 60 feet from where the defendant, Martin, was standing. The defendant was directed to step into the beam of the cruiser's headlights, and, when he did, the victim identified him as one of the assailants.

This Court said that ''[t]here was nothing 'so unnecessarily suggestive' about [the victim's] identification of the defendant that the latter was denied due process of law.'' *Id.* at 692, 173 S.E.2d at 798-99. We also said that, although the victim had indicated uncertainty while on the witness stand about his in-court as well as his pretrial identification, the testimony of a police officer that the victim, on the night of the robbery, had made a positive identification of the defendant, was sufficient ''to support the jury's finding that the defendant was one of the persons who attempted to rob the [victim].'' *Id.* at 692, 173 S.E.2d at 799.

Hence, the identification in *Martin* was neither suggestive nor unreliable. We think the same statement can be made concerning Ms. Bern's identification here. Indeed, on the facts, the present case is indistinguishable from *Martin*. Bearing in mind that ''[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification,'' *Biggers*, 409 U.S. at 198, we can say in all fairness that there was nothing suggestive about the police conduct involved in the identification procedure by which Ms. Bern identified Satcher. On the subject of reliability, Ms. Bern was positive in her identification of Satcher when she testified in the guilt phase. And any uncertainty she may have expressed while testifying in the sentencing phase was removed by her unequivocal affirmative response to the question whether she identified Satcher at his preliminary hearing as ''the one who ran by [her on the] morning [of August 18, 1990].'' Accordingly, we hold that the trial court did not err in admitting Ms. Bern's testimony.

### Sufficiency of the Evidence to Convict

Satcher's challenge to the sufficiency of the evidence is limited to the question of identity. In resolving this question, we view the evidence and the reasonable inferences fairly drawn therefrom in the

light most favorable to the Commonwealth. *Spencer I*, 238 Va. at 283, 384 S.E.2d at 779.

Satcher argues that the only evidence linking both offenses to the same assailant was the fact that the purses of the two victims were found in the same general vicinity. He also notes that the awl found in his car was tested and found to contain no traces of blood and that, although the medical examiner said the awl was consistent with Ann Borghesani's wounds, she could not say it was the murder weapon. However, these were all relevant circumstances surrounding the offenses with which Satcher was charged; they were properly submitted to the jury; and they were entitled to such weight as the jury might assign them.

Satcher also contends the testimony of a forensic serologist showed that, in the tests she conducted, Satcher could not be eliminated as a donor of a semen stain found on Ann Borghesani's pants. This witness said that seven percent of the population were possible contributors to the stain and, of eleven blood samples taken from suspects, two persons, Satcher and someone designated as "WL," could have contributed to the stain. These results, Satcher maintains, indicate that more than one person was involved in the murder of Ann Borghesani and that he, Satcher, was not the "triggerman."

This theory, Satcher submits, is supported by the fact that a semen stain found on Ann Borghesani's coat could not be typed because of insufficiency in amount and, hence, the stain "could have come from any man." The theory gains additional support, Satcher says, from the testimony of Myron Scholberg, the defense hair expert, who said that the foreign hair found in Ann Borghesani's pubic area could not have originated from Satcher.

However, additional tests eliminated "WL" as a possible contributor to the stain on the pants, leaving Satcher as the sole donor. And to say that the inability to type the stain found on the coat means that more than one person was involved in the murder would be pure speculation. Furthermore, what Myron Scholberg said concerning the pubic hair was an admittedly inconclusive opinion, and it was insufficient, standing alone, to support even the possibility that more than one person was involved in Ann Borghesani's murder.

Finally, with respect to the charges involving Deborah Abel, Satcher reiterates his arguments that her in-court identification was highly suggestive, that there were gross discrepancies between her description of him and his actual appearance, and that her lineup

identification was completely inaccurate. Concerning the charges involving Ann Borghesani, Satcher repeats his argument that DNA testing is unreliable. We have rejected these arguments in earlier portions of this opinion, with the resultant holding that all the evidence to which the arguments relate was properly submitted to the jury for its consideration and attendant assessment of weight.

From our consideration of the sufficiency question, an overriding observation emerges. While other evidence supports all the convictions in this case, Deborah Abel's in-court identification of Satcher was sufficient alone to establish him as her assailant and the DNA typing was adequate by itself to show he was Ann Borghesani's murderer.

*Instructions*

Satcher contends the trial court erred in refusing his Instruction J, which would have limited the jury's consideration of Satcher's pretrial "I-am-being-framed-for-murder-or-rape" statement to its bearing on his credibility. However, this limitation is applicable only to "a witness who is not a party to the case on trial." *Pugh* v. *Commonwealth*, 233 Va. 369, 374, 355 S.E.2d 591, 594-95 (1987).

Satcher contends next that because his theory of the case was that "any identifications of him were wrong," the "eyewitness testimony and DNA test results were central to the identification issue." He says that he elicited testimony that "both identifications were unreliable" and that the trial court erred, therefore, in refusing his Instructions L and Q, which he describes as "specific instruction[s] on how the jury should have considered [the identification] issues." But in *Poole* v. *Commonwealth*, 211 Va. 258, 176 S.E.2d 821 (1970), we said that where, as here, "the jury is fully instructed on presumption of innocence and reasonable doubt, a separate instruction on identity is not required." *Id.* at 261, 176 S.E.2d at 824.

The trial court refused Satcher's proffered Instruction R, which would have permitted the jury to find him guilty of first or second degree murder, rather than capital murder, and granted Instruction 17, which effectively limited the jury's options to capital and first degree murder. Satcher says this was error, but we find no evidence in the record which would have supported an instruction on second degree murder. Accordingly, it was not error to refuse

Instruction R and to grant Instruction 17. *See Buchanan*, 238 Va. at 409, 384 S.E.2d at 769.

■■■ Satcher offered Instruction B, which dealt with reasonable doubt, and Instruction C, which dealt with presumption of innocence and reasonable doubt. The trial court granted C, but refused B as duplicative of C. This was not error. *Eaton*, 240 Va. at 255, 397 S.E.2d at 398.

■■■ Over Satcher's objection, the trial court granted Instruction 15, which informed the jury that in establishing capital murder, the Commonwealth was required to prove that "the killing was willful, deliberate and premeditated." Satcher says that the indictment did not charge capital murder because it did not contain the "willful, deliberate and premeditated" language and that Instruction 15 was improper because based upon a defective indictment. However, the indictment was in the statutory short form, and it fully informed Satcher "of the nature and cause of the accusation against him." Code § 19.2-221. Hence, it was unnecessary to include the words "willfully, deliberately and premeditatedly" in the indictment. *See Simpson* v. *Commonwealth*, 221 Va. 109, 115, 267 S.E.2d 134, 139 (1980).

■■■ Instruction 14, which was granted, told the jury that it "may infer malice from the deliberate use of a deadly weapon." Satcher says the instruction "impermissibly shift[ed] the burden of proof to the defendant." But in *Warlitner* v. *Commonwealth*, 217 Va. 348, 228 S.E.2d 698 (1976), *cert. denied*, 430 U.S. 957 (1977), this Court held that such an instruction did not "impose upon the accused any burden of persuasion." *Id.* at 350, 228 S.E.2d at 700.

## SENTENCING PHASE

### Denial of Recess

The jury returned its verdict finding Satcher guilty of capital murder about 4:30 on the afternoon of the eighth day of trial. When the trial court indicated its intention to proceed with the sentencing phase the same afternoon, Satcher moved for an overnight recess. Stating that the jury's expressed wish to commence the sentencing phase that afternoon was an "important consideration," the trial judge denied the motion.

■■■ Satcher contends that the trial court's action was a denial of his "rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and section[s] 8 and 9 of

Article I of the Constitution of Virginia." We disagree. Whether a recess should have been granted was a matter for the exercise of the trial court's discretion, and we find no abuse of discretion in the denial of Satcher's motion.

*Sentence Review*

In a capital case, this Court is required to consider and determine whether "the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Code § 17-110.1(C)(1). We are also required to determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1(C)(2).

The bulk of the Commonwealth's evidence at the sentencing phase consisted of Satcher's criminal activities on August 18, 1990, the day he was arrested after his encounter with Joyce Bern. About 9:30 a.m. on that date, Joanna Chusid was walking along a bicycle path in the vicinity of Joyce Bern's home when she was grabbed from behind and forced into the woods by a black man displaying a Swiss army knife. The attack ended when Ms. Chusid urinated involuntarily and her assailant departed.

About 11:30 a.m. the same day, Regina Overholt was walking along the same bicycle path when she was grabbed from behind and forced off the path by a man displaying a knife with a four-inch blade. The attack was broken off when Patricia Schmidt and Joel Rogers arrived on the scene in response to Ms. Overholt's screams. Accompanied by her rescuers, Ms. Overholt walked "up the bike path . . . [a]nd at the top" found Joyce Bern, who assisted her in calling the police. Overholt, Schmidt, Bern, and Rogers all said that the assailant's clothing consisted of red sweat pants, white T-shirt, and a black "fanny pack."

About noon on the same day, Alice Rooney was jogging on the bicycle path when she saw a man sitting on a foot bridge. Becoming apprehensive, she increased her pace, and the man started running after her. When she observed "a motorcycle officer coming [her] way [she] just took off." She said that the man who chased her wore red sweat pants and carried a white T-shirt in his hand.

The officer was James Lee Page, and he was riding along the bicycle path in response to a call to be on the lookout for a black male wearing red sweat pants, white T-shirt, and "a black waist

wallet." Page saw a woman jogger coming toward him with a man "[o]ne to two feet" behind her. He stopped the man, ascertained he was Michael Satcher, and called for "a back up."

Officer Brian Cammarata arrived, and he asked Satcher twice what he had in his hand. Receiving no response, Cammarata "grabbed at" the item, and it fell to the ground. It turned out to be Satcher's T-shirt, wrapped around a knife. Satcher was placed under arrest, Joyce Bern was brought to the scene, and she identified Satcher as the person she had encountered a short time earlier.

At the sentencing phase, Satcher submitted testimony from family members and friends that he was a quiet individual who had never demonstrated any violent propensities. He was described as a caring and loving father and as a person who helped others. He was considered by a jail counselor as "the meekest, mildest, quietest, [most] self-effacing person that [he had] ever seen in jail."

## Passion and Prejudice

Satcher contends his death sentence was the product of passion and prejudice because he was tried by an all-white jury for the rape and murder of a young white woman. He also says the situation was exacerbated by the admission of evidence concerning offenses against three other white women and by testimony from the mother and close friends of the murder victim.

■ We disagree with Satcher. In the first place, nothing in the record supports his statement that his jury was all white. But, aside from that, neither is there anything in the record to support his claim that any sort of racial bias entered into the trial of this case or produced any passion or prejudice against him. And we find no indication of undue sympathy on the part of the jury for the victim's family or friends.

■ Satcher also argues that passion and prejudice were created by the consolidation for trial of the Abel and Borghesani offenses and by the presence of jurors who stated on *voir dire* that they were predisposed toward the death penalty. However, earlier in this opinion, we found that no error existed in the trial court's rulings concerning these matters. We now find that no passion or prejudice resulted from the court's actions, whether the actions are considered singly or collectively.

## Excessiveness and Disproportionality

Satcher argues that the ''excessiveness and disproportionality of the sentence is demonstrated by the fact that [he] had no history of violence and his prior criminal history consisted of two misdemeanor drug offenses.'' Furthermore, he says, there was ''a significant amount of mitigating evidence.''

It is true that Satcher had only two previous convictions, one for attempted possession of PCP and the other for distribution of marijuana. But he violated the terms of his probation by continuing to use drugs and was incarcerated for a period of 180 days. And to say that he has no history of violence is to ignore the fact that he was a veritable one-man-crime wave on the bicycle paths of Arlington County on March 31 and August 18 of 1990.

Furthermore, the violence of his attack upon Ann Borghesani is almost unparalleled in our death-penalty cases. He stabbed her a total of twenty-one times. Three wounds were fatal, the first penetrating the heart and extending three and one-half inches into the chest, the second piercing the left lung to a depth of three inches, and the third severing the jugular vein on the right side of the neck. There were six other stab wounds to the chest and abdomen, three to the right lower back, and nine to the neck. The victim was also beaten about the face, causing bruises and lacerations to her eyes, nose, cheeks, forehead, lips, jaw, and chin. Her knees, feet, and toes also bore bruises and abrasions.

That Deborah Abel, Joanna Chusid, Regina Overholt, and Alice Rooney did not suffer similar fates at Satcher's hands can only be ascribed to fortuity. And it is no wonder that the jury, after considering all the evidence, should decide that the mitigating evidence submitted by Satcher was not sufficient to justify a sentence less than death.

The jury found in the murder of Ann Borghesani both ''future dangerousness,'' viz., ''there is a probability that [Satcher] would commit criminal acts of violence that would constitute a continuing serious threat to society,'' and ''vileness,'' viz., Satcher's ''conduct in committing the offense . . . was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim.'' Code § 19.2-264.2. Satcher does not challenge the sufficiency of the evidence with

respect to either of these statutory predicates. However, our independent review of the evidence satisfies us that the jury's findings were correct.

In determining whether a sentence of death is excessive or disproportionate, we consider the records of all capital murder cases previously reviewed by this Court in which the death sentence was based upon both predicates, including cases where life imprisonment was imposed. The test for determining excessiveness or disproportionality is whether other sentencing bodies in this jurisdiction generally impose the death sentence for similar conduct, considering both the crime and the defendant. Code § 17-110.1(C)(2); *Stamper* v. *Commonwealth*, 220 Va. 260, 283-84, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980).

Previous cases in which the death sentence was imposed upon a finding of both "future dangerousness" and "vileness" are collected in *Spencer II*, 238 Va. at 319-20, 384 S.E.2d at 800, and supplemented in *George* v. *Commonwealth*, 242 Va. 264, 284-85, 411 S.E.2d 12, 24 (1991), *cert. denied*, 503 U.S. ___, 112 S.Ct. 1591 (1992), which was itself a case involving a finding of both statutory predicates. From a consideration of our previous cases, we find that Satcher's death sentence is not excessive or disproportionate to the punishment generally imposed by other sentencing bodies in this jurisdiction for similar conduct.

Finding no error in any rulings of the trial court and perceiving no other reason to disturb the sentence of death, we will affirm the convictions and sentences involved in this appeal.

*Affirmed.*

JUSTICE HASSELL, with whom JUSTICE WHITING joins, dissenting.

I dissent because I believe that the trial court committed reversible error which deprived Satcher of a fair trial.

The trial court erred in failing to grant Satcher's motion for separate trials. Satcher was indicted and tried for crimes against two separate victims. He was found guilty of the following offenses relating to Deborah Abel: attempted rape, assault and battery, and robbery. He was also tried and convicted of the following offenses relating to Ann Borghesani: rape and capital murder.

The offenses involving Deborah Abel occurred on March 31, 1990, at approximately 7:15 p.m. The record does not establish the time that Ann Borghesani was raped and murdered. Ms. Borghesani was last seen alive on March 31, 1990, at 7:10 p.m. in her apartment. Her body was discovered some time after 6:45 a.m. on the following morning, April 1, 1990.

Rule 3A:10(b) of the Rules of this Court states:

> *An Accused Charged With More Than One Offense.* The court may direct that an accused be tried at one time for all offenses then pending against him, if justice does not require separate trials and (i) the offenses meet the requirements of Rule 3A:6(b) or (ii) the accused and the Commonwealth's attorney consent thereto.

Rule 3A:6(b) states:

> *Joinder of Offenses.* — Two or more offenses, any of which may be a felony or misdemeanor, may be charged in separate counts of an indictment or information if the offenses are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan.

There is no evidence in the record which reveals that the offenses committed against Deborah Abel and Ann Borghesani "are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan." *Id.* Contrary to the assertions contained in the majority's opinion, there is no evidence from which a proper inference can be drawn that the acts are connected.

We have not heretofore discussed under what circumstances "two or more acts or transactions . . . are connected" in the context of Rule 3A:6(b). However, we have discussed the requisites which must be present before a crime can be deemed to be "connected" to another crime. In *Walker* v. *Commonwealth*, 28 Va. (1 Leigh) 574 (1829), we stated:

> It frequently happens, however, that as the evidence of circumstances must be resorted to for the purpose of proving the commission of the particular offence charged, the proof of

those circumstances involves the proof of other acts, either criminal or apparently innocent. In such cases, it is proper, that the chain of evidence should be unbroken. If one or more links of that chain consist of circumstances, which tend to prove that the prisoner has been guilty of other crimes than that charged, this is no reason why the court should exclude those circumstances. They are so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety; and there is no reason why the *criminality* of such intimate and connected circumstances, should exclude them, more than other facts apparently innocent.

*Id.* at 576 (emphasis in original). In *Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 176 S.E.2d 802 (1970), we repeated the rule articulated in *Walker*.

[T]estimony of other crimes is admissible where the other crimes constitute a part of the general scheme of which the crime charged is a part. Frequently it is impossible to give a connected statement showing the crime charged without incidental reference to such contemporaneous and similar crimes and where there is only such incidental disclosure of other offenses.

*Id.* at 272, 176 S.E.2d at 805. Furthermore, while approving the admission in evidence of prior criminal conduct committed by a defendant, we stated:

They [the crimes] are "so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety; and there is no reason why the criminality of such intimate and connected circumstances, should exclude them, more than any other facts apparently innocent."

*Id.* at 276, 176 S.E.2d at 807-08 (quoting *Walker*, 28 Va. (1 Leigh) at 576).

Numerous courts, which have considered Rule 8 of the Federal Rules of Criminal Procedure,\* which is substantially similar to Rule

---

\* Rule 8(a) of the Federal Rules of Criminal Procedure states:

3A:6(b), have essentially applied the *Kirkpatrick* rule when determining if offenses can be tried together over the defendant's objection. For example, the court in *United States* v. *Montes-Cardenas*, 746 F.2d 771 (11th Cir. 1984) stated:

> Offenses may be joined if they are based on ''two or more acts or transactions connected together or constituting part of a common scheme or plan.'' Fed.R.Crim.P. 8(a). Two crimes are ''connected'' together if the proof of one crime constitutes a substantial portion of the proof of the other. *See, e.g. United States* v. *Sweig,* 441 F.2d 114, 118-19 (2nd Cir.) *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971); *United States* v. *Weber,* 437 F.2d 327, 331 (3rd Cir. 1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971); *see also United States* v. *Halper,* 590 F.2d 422, 492 (2nd Cir. 1978) (joinder improper when commission of one crime did not lead to commission of the other and proof of one did not constitute proof of the other).

*Id.* at 776. The Ninth Circuit Court of Appeals recently held that ''[t]wo crimes are connected together if the proof of one crime constitutes a substantial portion of the proof of another.'' *United States* v. *Terry,* 911 F.2d 272, 276 (9th Cir. 1990) (quoting *Montes-Cardenas,* 746 F.2d at 776).

Joint trials are permissible, in certain circumstances, to avoid unnecessary inconvenience to witnesses, the accused, the government, and the court. As we observed in *Kirkpatrick*, the facts giving rise to the offenses charged against the defendant may be '' 'so intimately connected and blended''' that they cannot be '' 'departed from with propriety.''' 211 Va. at 276, 176 S.E.2d at 807 (quoting *Walker*, 28 Va. (1 Leigh) at 576). Neither the majority nor the Commonwealth has shown that the facts relating to the acts perpetrated against Ms. Abel are ''intimately connected or blended'' with the acts committed against Ms. Borghesani. Additionally, neither the

---

**Joinder of Offenses.** Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.[14]

[14] This rule differs from Rule 3A:6 because it includes the phrase ''are of the same or similar character.''

majority nor the Commonwealth has shown that evidence necessary to prove Satcher's offenses against Ms. Abel constitutes a substantial portion of the proof involving the offenses perpetrated against Ms. Borghesani, as required by *Kirkpatrick*.

In *Day* v. *Commonwealth*, 196 Va. 907, 86 S.E.2d 23 (1955), a case remarkably similar to this case and which is not discussed by the majority, we rejected the same argument which the Commonwealth advances and the majority approves today. In *Day*, the defendant was indicted for attempted rape, robbery, and sodomy of a single victim, Della Claytor. The indictments were tried together and the defendant was convicted of each offense and the jury fixed his punishment at death.

In *Day*, evidence was admitted of an attempted attack by Day on a witness, Mrs. Stanford, which occurred at 7:10 p.m. on February 1, 1954. *Day*, 196 Va. at 910, 86 S.E.2d at 24-25. Day attacked Della Claytor, his second victim, later that evening and took her to a vacant lot. *Id.* at 908, 86 S.E.2d at 23. He attempted to rape her but was unable to do so. *Id.* at 908, 86 S.E.2d at 23-24. Day then sodomized and beat Claytor. *Id.* at 908, 86 S.E.2d at 24. Day took Claytor to her home where her daughter and her daughter's two small children were present. *Id.* at 908-09, 86 S.E.2d at 24. Soon thereafter, two of Claytor's neighbors arrived and after a brief conversation, they left the house with Day. *Id.* at 909, 86 S.E.2d at 24. Later that evening, Day returned to Claytor's home, broke the lock on the door, and abducted Claytor. *Id.* The police found Day and Claytor approximately five blocks from her home. *Id.*

While the record in *Day* does not disclose the exact time of Day's attack on Claytor, Claytor's daughter testified that she called the police after Day abducted her mother from the house. *Id.* A police officer testified that he received a complaint from someone at Claytor's home at 7:46 p.m. on February 1, 1954. *Id.* These facts indicate that Day's crimes committed against Claytor occurred between 7:10 p.m. and sometime well before 7:46 p.m. Thus, it is proper to infer that the first attack of Claytor occurred within minutes of his attempted attack on Mrs. Stanford.

The Commonwealth argued in *Day* that Stanford's testimony was admissible because it tended to identify the accused by placing him in the vicinity at the time that the victim was assaulted and "to show his intent and plan to make an assault on some woman," the *sine qua non* of the Commonwealth's position in this case. *Id.* at 912, 86 S.E.2d at 25. Mrs. Stanford, testified that:

"[S]he was standing on the corner of Grace and Knight Streets waiting for a bus at 7:10 o'clock on the night of February 1, 1954. While she was standing there she stated she saw the defendant, or a man she felt reasonably sure was the defendant, Earl Day, coming towards her. She was frightened and started to run and he started to run after her. She saw the bus coming and she ran to the bus and he chased her to the door of the bus. As she was getting on the bus she heard him call something like, 'You had better run.' [S]he said the man was [Day] but she did not see his features but the man wore a white cap and a jacket like the ones belonging to [Day] and which were exhibited to her. . . . At this time [upon returning over the same route on the next bus] she saw the same man who had chased her at Knight and Grace Streets standing near the corner of Locust and Grace Streets, which was one city block from Grace and Knight Streets. She never did see the man's face so as to positively identify him but she did notice he was wearing a similar cap and jacket to those worn by the man who had chased her."

*Id.* at 910-11, 86 S.E.2d at 24-25.

Rejecting the Commonwealth's argument, we reversed Day's capital murder conviction and remanded the case for a new trial. We stated, clearly and unequivocally:

The accepted rule to be derived from the cases is that evidence which shows or tends to show the accused guilty of the commission of other offenses at other times is inadmissible if its only relevancy is to show the character of the accused or his disposition to commit an offense similar to that charged; but if such evidence tends to prove any other relevant fact of the offense charged, and is otherwise admissible, it will not be excluded merely because it also shows him to have been guilty of another crime.

*Id.* at 914, 86 S.E.2d at 26-27.

The majority, without explanation, deviates from *Day*, which has not been overruled and which has been cited as controlling authority in numerous cases. *See Largin* v. *Commonwealth*, 215 Va. 318, 320, 208 S.E.2d 775, 777 (1974); *Bunting* v. *Commonwealth*, 208 Va. 309, 314, 157 S.E.2d 204, 208 (1967); *Rees* v. *Commonwealth*, 203 Va. 850, 870, 127 S.E.2d 406, 419 (1962), *cert. denied*, 372 U.S.

964, *reh'g denied,* 373 U.S. 947 (1963); *Williams* v. *Common-wealth,* 203 Va. 837, 841, 127 S.E.2d 423, 426 (1962); *Sturgis* v. *Commonwealth,* 197 Va. 264, 268, 88 S.E.2d 919, 922 (1955). Furthermore, *Day* is consistent with the rule we articulated in *Walker* and *Kirkpatrick* and we have cited *Day* as the law in this Commonwealth since our holding in *Kirkpatrick. See Largin,* 215 Va. at 320, 208 S.E.2d at 777.

The majority ignores our precedent and concludes that the crimes are "connected" because of certain facts. The record, however, does not support the inferences upon which the majority's conclusion is based. First, the majority states, "the two crimes occurred within a few yards in about one-half hour of each other." The majority's assertions here are not facts, but rather are inferences. However, these inferences are not reasonable and are flawed.

There is no evidence in the record which supports an inference that the crimes occurred within "about one-half hour of each other." Ms. Borghesani was last seen alive on March 31, 1990 at 7:10 p.m. in her apartment. She was expected to be the guest of honor at a belated birthday party at 8:00 p.m. at a friend's home in the Crystal City area of Arlington. The record does not establish the time that Ms. Borghesani left her apartment in Roslyn en route to her friend's home. The only proper inference that can be drawn is that Ms. Borghesani left her apartment sometime between 7:10 p.m. and 8:00 p.m. Furthermore, the medical examiner testified that it was not possible to determine the time of Ms. Borghesani's death.

There is no testimony in the record from which a reasonable inference can be drawn that the attack on Ms. Borghesani occurred within a "few yards" of the attack on Ms. Abel. Ms. Borghesani's body was not found within a "few yards" from the location where Ms. Abel was attacked. Likewise, there is no evidence in the record to support an inference that both victims were removed from the bicycle path at a location behind the sound barrier wall. The record simply does not reveal the exact location of Satcher's attack on Ms. Borghesani.

The majority, without any explanation, states that "from the evidence and reasonable inferences to be drawn therefrom, it is clear that the two or more acts involved in this case constituted parts of a common scheme or plan." This holding is conclusory and is neither explained by the majority nor supported by the record or our precedent. Furthermore, the majority ignores the legal differences between crimes that are "connected" and crimes that "constitute a

part of a common scheme or plan.'' The majority blurs the distinction between these concepts and treats them as though they are synonymous.

In *Kirkpatrick*, 211 Va. 269, 176 S.E.2d 802, we stated that ''testimony of other crimes is admissible where the other crimes constitute a part of the general scheme of which the crime charged is a part.'' 211 Va. at 272, 176 S.E.2d at 805. In *McWhorter* v. *Commonwealth*, 191 Va. 857, 63 S.E.2d 20 (1951), we said:

> Another exception to the general rule is that evidence of similar acts is admissible to show a common scheme, design, or plan where there is'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'

(Citations omitted). *Id.* at 870-71, 63 S.E.2d at 26. *See also Boyd* v. *Commonwealth*, 156 Va. 934, 944, 157 S.E. 546, 550 (1931).

The Court of Appeals, discussing whether two robberies were part of a common scheme or plan in the context of Rule 3A:6(B), stated:

> A common scheme or plan is present only if the 'relationship among offenses . . . is dependent upon the existence of a plan that ties the offenses together and demonstrates that the objective of each offense was to contribute to the achievement of a goal not obtainable by the commission of any of the individual offenses.'

*Spence* v. *Commonwealth*, 12 Va. App. 1040, 1044, 407 S.E.2d 916, 918 (1991) (citations omitted). This definition of ''common scheme or plan'' has also been accepted by legal scholars. For example, the following statement is found in *1 Wharton's Criminal Evidence* § 186 (Charles E. Torcia ed., 14th ed. 1985):

> Evidence of other crimes is admissible when it tends to establish a common plan, design, or scheme embracing a series of crimes, including the crime charged, so related to each other that proof of one tends to prove the other.

*Id.*

The majority relies upon *Cheng* v. *Commonwealth*, 240 Va. 26, 393 S.E.2d 599 (1990), to support its holding that the trial court did not err by failing to grant Satcher's motion for separate trials. *Cheng* does not support the majority's position. Dung Cheng, who was indicted for several offenses arising out of a murder, filed a pretrial motion to sever the indictment for possession of a "sawed-off" shotgun from indictments for offenses including capital murder, abduction, robbery, conspiracy to commit abduction, and murder of the victim, Hsiang Liu.

Cheng and his cohorts had planned to commit a robbery. In furtherance of the plan, Cheng directed his cohorts to "bring the shotgun and the jeep." On the evening of the abduction, robbery, and murder of the victim, a bag containing the shotgun was placed in Cheng's jeep. We stated that the shotgun possession offense and the other offenses were connected and that the evidence indicated that the offenses were parts of a common scheme or plan.

Here, unlike *Cheng*, there are multiple victims who were attacked at different times and there is no evidence that the offenses constitute parts of a common scheme or plan. Satcher did not commit any act in his crimes against Ms. Abel which contributed to the achievement of his crimes against Ms. Borghesani. Thus, it is not surprising that the majority fails to articulate its so-called common scheme or plan because it is unable to do so.

Today, the majority, in a capital murder case, creates a new definition for the word "connected" which permits the Commonwealth to try cases jointly when the only relevance is to show the character of the accused and the accused's disposition to commit offenses similar to those charged. I fail to understand why, in a capital murder case, the majority departs from established precedent which we have applied consistently since 1829. *See Walker* v. *Commonwealth*, 28 Va. (1 Leigh) 574. I also fail to understand why the majority makes no effort to reconcile its new definition of "connected" with our clear and established precedent which the majority has either overruled or conveniently ignored. Furthermore, the majority, by blurring the distinction between "crimes that are connected" and "crimes that constitute a common scheme or plan" has created confusion in this important distinction in the law.

I am not aware of any other case decided by this Court in which we have approved the trial of separate crimes which are not connected and which are not a part of a common scheme or plan. Such practice is so unfair and unjust that it constitutes a denial of

Satcher's rights to due process of law guaranteed by the federal constitution and the Constitution of Virginia. U.S. Const. amend. XIV, § 1; *Ham* v. *South Carolina*, 409 U.S. 524, 526-27 (1973) (citing *Lisenba* v. *California*, 314 U.S. 219, 236 (1941)); Va. Const. art. I, § 8. Therefore, I respectfully dissent.